Angela Christine **THORNTON,** Appellant,

v.

The **STATE** of Texas, State.

No. 2–98–348–CR.

Court of Appeals of Texas, Fort Worth.

May 27, 1999.

**848**

Lauren B. Chadwick, Fort Worth, for appellant.

Tim Curry, Criminal Dist. Atty., Charles M. Mallin, Asst. Criminal Dist. Atty., Helena F.Faulkner, Asst. Criminal Dist. Atty., Betty Arvin, Asst. Criminal Dist. Atty., Mark Thielman, Asst. Criminal Dist. Atty., Fort Worth, for appellee.

## OPINION

LIVINGSTON, Justice.

In fifteen points, appellant Angela Christine Thornton challenges her conviction for serious bodily injury to a child by omission. Points one through three are challenges to the sufficiency of the evidence. In points four and five, she complains the trial court allowed the State to commit the jury to a specific set of facts for a specific punishment. In points six through eleven, she contends the court improperly admitted "back-door" hearsay. In points twelve through fifteen, she contends the trial court improperly admitted an edited transcript from a talk show despite insufficient indicia of authenticity and reliability. Because the evidence is legally and factually sufficient and because there was no error during voir dire or in the admission of evidence, we affirm the trial court's judgment.

## I. BACKGROUND

Appellant's two children C.T. and J.T. attended a public day care center (Center) in Arlington. The Center noticed C.T. smelled of urine and was concerned that he was not receiving proper nutrition. Because of these concerns, the Center contacted the Texas Department of Protective and Regulatory Services (DPRS) and reported possible neglect. Cynthia Tranquilli, a Child Protective Specialist with the agency, investigated. On October 10, 1996, Tranquilli visited the Center and spoke with appellant's four-year-old son C.T. After this interview, Tranquilli contacted appellant and scheduled a home visit on October 14. On October 11, the day after Tranquilli's phone call, appellant removed both C.T. and J.T. from the Center.

During the home visit, Tranquilli completed a Child Safety Evaluation Plan that appellant signed.[1] Tranquilli explained to appellant the importance and possible consequences of failing to abide by the plan. Tranquilli did not see appellant again until November 11, 1996.[2]

---

1. A safety plan is a written agreement between the parents and the agency. The plan outlines the investigator's concerns and ways to correct those concerns. After a plan is drafted, there can be follow-up visits and monitoring. In addition, DPRS may provide services if a parent fails to rectify the problems listed in the plan.

2. The record does not indicate why there had not been a follow-up on appellant's case.

On November 10, appellant took C.T. to the emergency room. There, doctors discovered that C.T. had a string wrapped tightly around his penis. Doctors estimated the string was affixed ten to fourteen days earlier. Moreover, the string was tied so tightly that it cut all the way through the urethra causing it to grow into surrounding tissue. The string also cut off circulation to the tip of the child's penis. The subsequent lack of blood destroyed surrounding tissue and necessitated removal of the necrotic tissue.

## II. DISCUSSION

### A. Legal and Factual Sufficiency

Appellant was charged and convicted with injury to a child by omission. In points one and two, appellant argues the evidence is insufficient to support either the trial court's denial of her request for an instructed verdict or proof she committed the offense. Point three poses a challenge based on factual insufficiency.

Appellant asserts the evidence establishes that her boyfriend, Chuy Hernandez, fastened the string without her knowledge. She also asserts that she was unaware of the string during the ten to fourteen-day period because she did not see C.T. "nude" during that period. Lastly, appellant claims that immediately after discovering the string, she took C.T. for medical care.

The pertinent portion of the indictment charged appellant with "INTENTIONALLY OR KNOWINGLY, BY OMISSION, CAUS[ING] SERIOUS BODILY INJURY ... BY FAILING TO PROVIDE TIMELY ADEQUATE MEDICAL TREATMENT...." TEX. PENAL CODE ANN. § 22.04(a)(1) (Vernon 1994) (injury to a child, elderly individual, or disabled individual). Because appellant is charged with failure to seek medical treatment for C.T., determination of who affixed the string is immaterial. Similarly, there is no dispute that C.T.'s injury was a "serious bodily injury" or that appellant had a duty to act.

TEX. PENAL CODE ANN. §§ 1.07(46); 22.04(b) (Vernon 1994). Thus, our review will focus on whether the State proved appellant's intentional or knowing conduct (omission) resulted in serious injury to C.T. *See Dusek v. State*, 978 S.W.2d 129, 133 (Tex. App.—Austin, 1998, pet.ref'd) (injury to a child is a "result of conduct" offense).

It is not sufficient if the State simply proved appellant failed to provide medical care for a serious injury. *See id.* We must determine whether the State proved appellant acted "intentionally" by failing to act "either with the conscious objective or desire to cause serious bodily injury." TEX. PENAL CODE ANN. § 6.03(a) (Vernon 1994); *see also Dusek*, 978 S.W.2d at 133. Alternatively, we must determine whether the State proved appellant acted "knowingly" by failing to act with an "awareness that serious bodily injury was reasonably certain to result." TEX. PENAL CODE ANN. § 6.03(b); *Dusek*, 978 S.W.2d at 133.

### 1. Standard of Review

A challenge to the denial of a motion for instructed verdict is actually a challenge to the legal sufficiency of the evidence. *See Madden v. State*, 799 S.W.2d 683, 686 (Tex.Crim.App.1990), *cert. denied*, 499 U.S. 954, 111 S.Ct. 1432, 113 L.Ed.2d 483 (1991). In reviewing the legal sufficiency of the evidence to support a conviction, we view the evidence in the light most favorable to the verdict. *See Narvaiz v. State*, 840 S.W.2d 415, 423 (Tex. Crim.App.1992), *cert. denied*, 507 U.S. 975, 113 S.Ct. 1422, 122 L.Ed.2d 791 (1993). The critical inquiry is whether, after so viewing the evidence, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *See McDuff v. State*, 939 S.W.2d 607, 614 (Tex.Crim.App.), *cert. denied*, —— U.S. ——, 118 S.Ct. 125, 139 L.Ed.2d 75 (1997). The verdict may not be overturned unless it is irrational or unsupported by proof beyond a reasonable doubt.

*See Matson v. State,* 819 S.W.2d 839, 846 (Tex.Crim.App.1991).

■ In reviewing the factual sufficiency of the evidence to support a conviction, we must look to all of the evidence "without the prism of 'in the light most favorable to the verdict.'" *Clewis v. State,* 922 S.W.2d 126, 129 (Tex.Crim.App.1996) (citing *Stone v. State,* 823 S.W.2d 375, 381 (Tex.App.—Austin 1992, pet. ref'd, untimely filed)). However, our review is not unfettered, for we must give "appropriate deference" to the fact finder. *Id.* at 136. We may not impinge upon the fact finder's role as the sole judge of the weight and credibility of witness testimony. *See Santellan v. State,* 939 S.W.2d 155, 164 (Tex. Crim.App.1997); *Dimas v. State,* 987 S.W.2d 152, 155 (Tex.App.—Fort Worth 1999, no pet.). The jury, as fact finder, was the judge of the facts proved and of reasonable inferences to be drawn therefrom. *See Kirby v. Chapman,* 917 S.W.2d 902, 914 (Tex.App.—Fort Worth 1996, no pet.). The weight given to contradictory testimonial evidence is within the sole province of the jury, because it turns on an evaluation of credibility and demeanor. *See Cain v. State,* 958 S.W.2d 404, 408–09 (Tex.Crim.App.1997). Thus, we must defer to the fact finder's weight-of-the-evidence determinations. *See id.* at 408. Consequently, we may set aside a verdict for factual insufficiency only when that verdict is so against the great weight and preponderance of the evidence so as to be clearly wrong and unjust. *See Clewis,* 922 S.W.2d. at 134–35.

### 2. The Evidence

■ Dr. Charles Mann, a pediatric surgeon with twenty-six years' experience, treated C.T. in the emergency room. He testified that the string was tied on between ten and fourteen days earlier. He based this estimate on the length of time it would take the urethra to heal and grow into the surrounding tissue.

Dr. Mann also testified that the injury was readily observable and would have been so for many days. His testimony reveals that there would have been apparent manifestations of the injury. He stated that as the string cut off circulation, C.T. would have been in excruciating pain. Other signs included significant spotting of blood. Finally, Dr. Mann testified that he was unsure how long it took the string to cut through the urethra. He stated that it could have taken several days or occurred in a matter of hours. Notwithstanding the possibility that the string cut through the urethra in a matter of hours, Dr. Mann stated it would have taken several days before the surrounding tissue and nerves died.

Dr. Leah Lamb, a pediatrician with Cooks Children's Physicians Network concurred in much of Dr. Mann's testimony. She stated that healing around the string indicated that it had been in place approximately ten days to two weeks. She also agreed that there would have been indications of injury. She testified that the child would have experienced "intense discomfort," due to his inability to urinate. This discomfort would have persisted until C.T.'s urethra "emperiz[ed]" allowing him to urinate from the side of his penis. Dr. Lamb testified that based on the length of time the string remained affixed and the resulting injuries, there was clearly a failure to seek timely medical treatment.

In addition to the expert testimony, appellant testified at trial that she did not know of the string until the morning she took C.T. to the emergency room. She claimed that she had tried to get the string off, but was unable to do so. Although she had laundered C.T.'s clothing, appellant contended that she had not noticed blood stains in C.T.'s clothing. Similarly, she claimed that C.T. always bathed and clothed himself; thus, she contended that she had not seen C.T. nude during the period in question.

In contrast, Melody Lancaster, C.T.'s foster parent following this incident, testified that C.T. was unable to bathe, sham-

poo, or "wipe" himself. She stated that because of C.T.'s age, she had to assist him in these activities.

An edited transcript from the March 5, 1997 Geraldo Rivera Talk Show (Geraldo) was also introduced. In that interview, appellant acknowledged that C.T. had a bed-wetting problem. Appellant stated that she did not punish C.T. for this problem, rather she contended that she simply sat C.T. on the "potty" before bed. In one response, appellant described how the string was attached to the child. She stated that the string was not "tied around [C.T.'s penis], it was just wrapped around it. It wasn't like it was tied in a little bow or something. It was just wrapped around him. It wasn't tied."

C.T. also testified regarding appellant's actions. In one instance, he testified that his mother did not take him for medical treatment on the same day he complained to her of the injury. However, in another instance, he stated that she took him the same day that he told her.

Viewing the evidence in the light most favorable to the verdict, the evidence is legally sufficient to support the jury's verdict. Moreover, when viewed in the appropriate manner, the evidence is also factually sufficient. Resolution of the inconsistencies in C.T.'s testimony, as to when appellant sought medical treatment, is merely weight-of-the-evidence determinations for the fact finder. *See Cain*, 958 S.W.2d at 408. Similarly, *contradictions* between witnesses' statements are resolved by the fact finder's determination of credibility. Accordingly, the evidence supporting the judgment was not so weak as to be manifestly unjust and clearly wrong. Therefore, we hold that the evidence is legally and factually sufficient to support the judgment. Points one through three are overruled.

### B. Voir Dire

The State made the following statement during voir dire:

In order to be a juror in this case, you must be able to tell the Court that [you] could keep an open mind to the entire range of punishment. That [you] could, in the appropriate case consider that full range, from five years probation up to 99 years or life. Okay. In the abstract.

What often happens, what I find, is that folks sit there. They hear ... the title of the offense .... [a]nd your mind jumps to some particular set of facts, which I don't know would be that worst case.... [Y]ou hear about some horrible child abuse case and you immediately think about those facts and say: I could never consider probation for that. That's outrageous.

[Y]ou don't have to. What are you doing when you start thinking about those cases? What you are doing is you're thinking about a particular set of facts. You are starting to think about particular fact situations and saying the right punishment for those facts is X. You are being a judge of the facts.

The prosecutor then made references to the need for the jury to keep an open mind. He continued with the following hypothetical.

We know that a child is somebody who is 14 years of age or younger. An adult in the [sic] Texas is somebody who is 17 or older. Some day you might hear [the] Ashley Estelle [case] if you are sitting as a juror.

Another case, 17 year old gets into some argument about, oh a 17 year old is a fixing to go to college and he is going to go to UT. And some 14 year old comes along and baits him about how A & M is the best place.... The 17 year old hits the 14 year old and breaks his nose.

. . . .

If you're the juror in that case, you hear that evidence, you find the defendant guilty. At the punishment phase you find out that the 17 year old has gone and gotten some counseling, perhaps, some anger control so that he

won't fly off the handle even if he was baited. He has paid the medical bills. He has got this college career before him that you have heard about. That may be a different case. That may not be a case that immediately comes to your mind. I don't know, a juror in that case might say: Okay, probation is appropriate.

I don't know what a—

■ At this point, appellant objected claiming the prosecutor was attempting to commit the jury to a specific set of facts for a specific punishment. The court overruled appellant's objection.

Before addressing the merits of appellant's argument, we must address the State's contention that appellant failed to preserve error on these points. The State argues appellant failed to preserve error by not timely objecting, because the prosecutor "was well into the complained-of discussion when Appellant objected."

■ To preserve error, an objection must be made at the earliest possible opportunity. *See Martinez v. State,* 867 S.W.2d 30, 35 (Tex.Crim.App.1993), *cert. denied,* 512 U.S. 1246, 114 S.Ct. 2765, 129 L.Ed.2d 879 (1994). Based on the nature of appellant's complaint, until the prosecutor completed his hypothetical, appellant had no reason to object. Appellant's objection was timely; therefore, error, if any, was preserved.

Appellant's points are predicated on a contention that the prosecutor attempted to "commit the jury to a specific set of facts for a specific sentence...." However, as we understand appellant's argument, it is more accurately characterized as "the prosecutor attempted to *limit* the jury to a specific sentence for a specific set of facts." In short, appellant argues the prosecutor was attempting to limit the jury's consideration of probation to only reasonable, trivial, or completely mitigated instances.

■ A trial court has wide discretion to control voir dire, and thus, its actions are reviewed under an abuse of discretion standard. *See Atkins v. State,* 951 S.W.2d 787, 790 (Tex.Crim.App.1997). To determine whether the trial court abused its discretion by allowing an improper question during voir dire, we look to the propriety of the question. *See Nunfio v. State,* 808 S.W.2d 482, 484 (Tex.Crim.App. 1991); *Anders v. State,* 973 S.W.2d 682, 686 (Tex.App.—Tyler 1997, pet. ref'd), *cert. denied,* —— U.S. ——, 119 S.Ct. 265, 142 L.Ed.2d 218 (1998). A question is proper if it seeks to discover a juror's view on an issue applicable to the case. *See Nunfio,* 808 S.W.2d at 484. In addition, hypotheticals, even fact specific hypotheticals, may be used in voir dire to explain application of the law. *See Atkins,* 951 S.W.2d at 789; *Heiselbetz v. State,* 906 S.W.2d 500, 511 (Tex.Crim.App.1995); *Anders,* 973 S.W.2d at 686; *but see White v. State,* 629 S.W.2d 701, 706 (Tex.Crim.App. 1981), *cert. denied,* 456 U.S. 938, 102 S.Ct. 1995, 72 L.Ed.2d 457 (1982) (holding a question too specific). It is improper, however, to attempt to ascertain how a juror would respond to certain facts. *See Heiselbetz,* 906 S.W.2d at 511.

■ In jury cases, the individual jurors must be able to consider the full range of punishment allowed by law. *See Sadler v. State,* 977 S.W.2d 140, 142–43 (Tex.Crim. App.1998). "They must be able, in a sense, to conceive both of a situation in which the minimum penalty would be appropriate and of a situation in which the maximum penalty would be appropriate." *Id.* (quoting *Fuller v. State,* 829 S.W.2d 191, 200 (Tex.Crim.App.1992), *cert. denied,* 508 U.S. 941, 113 S.Ct. 2418, 124 L.Ed.2d 640 (1993).[3]

In this instance, the hypothetical given was not remotely similar to the facts of the case. Furthermore, the prosecutor's statement was used to explain proper application of the law. That is, the state-

---

**3.** That is not to say a juror is required to consider the entire range of punishment for the crime in which the juror is sitting. *See Sadler,* 977 S.W.2d at 144.

ment demonstrated to the jurors their obligation, under appropriate fact situations, to consider the full range of punishment. We hold that the prosecutor's statement did not attempt to improperly require the venire members to commit to a particular set of circumstances; therefore, the trial court did not err in overruling appellant's objection. We overrule points four and five.

### C. Admission of Evidence

#### 1. Hearsay

 Points six through fifteen are evidentiary in nature. In point six, appellant contends the trial court erred in overruling her objection to "back door" hearsay. In point seven, she complains the trial court's admission of "back door" hearsay was harmful error. Points eight, nine, ten, and eleven challenge the "back door" hearsay on federal and state constitutional grounds.

Appellant complains that the following exchange during the State's examination of Arlington Police Officer Randy Lockhart introduced *indirect hearsay:*

Q. Did you interview ... other people in connection with this case?

A. Yes, sir.

Q. Without going into what was said, who were some of those people?

A. I spoke to some of the CPS workers.

[DEFENSE COUNSEL]: Your honor, at this time I would object to who he spoke to by suggesting names and titles. It's hearsay as to whose [sic] are those people.

[THE COURT]: Overruled. Be careful not to go into what was said. You may answer.

BY [THE STATE]:

Q. Among the folks you spoke with, sir?

A. I spoke to some of the CPS workers. I spoke to hospital staff, doctors. I spoke to a sister, Amy Thornton. I spoke to the grandparents. That's about it.

Q. Melody Lancaster?

A. Yes, talked to the parents.

Q. When you spoke with the parents or grandparents, is that Howard and Patty Thornton?

A. Yes, actually not Mr. Thornton but Patty Thornton.

Q. And sir, did you file these cases with the District Attorneys [sic] office?

A. I did.

[DEFENSE COUNSEL]: Your Honor, before he answers that, the evidence, I object to the back door hearsay. Their predicate is: Did you speak to all of these people and then did you file the case with the District Attorney's office? That's called back-door hearsay because [it is] the predicate to his filing of the case. That's my objection.

The court overruled appellant's objection.

The State contends that error was waived on appellant's state and federal constitutional points. It points out that no objection was made at trial on constitutional grounds. Appellant concedes this point, but she contends that this is fundamental error thereby not requiring an objection.

 We decline appellant's invitation to characterize this as fundamental error. Hearsay objections must be preserved with a timely and specific objection to the evidence. *See Moore v. State,* 935 S.W.2d 124, 130 (Tex.Crim.App.1996). An objection lodged solely as a hearsay objection will not preserve error on other grounds. *See e.g., Holland v. State,* 802 S.W.2d 696, 700 (Tex.Crim.App.1991).[4]

---

4. *Holland* held that a hearsay objection did not preserve an error predicated on lack of "confrontation." *Holland,* 802 S.W.2d at 700. Because the grounds for the two objections were "neither synonymous nor necessarily coextensive," the court reasoned the trial court had no notice of any other ground for exclusion. *Id.*

Unless apparent from the context, an objection must give the trial court notice of the basis for exclusion; otherwise, error is waived on that ground. *See id.* Because appellant failed to raise her constitutional claims at trial, they are not preserved.[5] Consequently, we will not address points eight through eleven. Notwithstanding appellant's failure to preserve error on constitutional grounds, appellant properly preserved error on points six and seven.

■ Relying on *Schaffer v. State,* appellant argues the trial court admitted hearsay testimony by letting the State *indirectly* introduce the testimony of CPS workers, hospital staff, and doctors. *Schaffer v. State,* 777 S.W.2d 111, 114 (Tex. Crim.App.1989). Put differently, appellant argues Lockhart's statement that he spoke with these individuals, followed by his statement that he filed the case, precipitates the conclusion that those individuals' statements implicated appellant.

■ When reviewing a trial court's decision to admit or exclude evidence, an appellate court "must afford a trial court great discretion." *Montgomery v. State,* 810 S.W.2d 372, 378–79 (Tex.Crim.App. 1990). Our review of a trial court's ruling on the admissibility of evidence is under an abuse of discretion standard. *See Angleton v. State,* 971 S.W.2d 65, 67 (Tex.Crim. App.1998).

■ "Hearsay" is an out-of-court statement offered in evidence to prove the truth of the matter asserted. Tex.R. Evid. 801(d). The indirect admission of such testimony is subject to the same rules and limitations as direct hearsay. *See Schaffer,* 777 S.W.2d at 113. Nevertheless, it is permissible for a police officer to testify that he was acting in response to information received. *See id.* at 114. While officers are restricted from "relat[ing] historical aspects of the case, replete with hearsay statements in the

form of complaints and reports," they may explain their presence and conduct. *Id.* at 114–15. An officer's testimony is not hearsay when it is admitted, not for the truth, but to establish the course of events and circumstances leading to the arrest. *See Reed v. State,* 794 S.W.2d 806, 809 (Tex.App.—Houston [14th Dist.] 1990, pet. ref'd). The critical question is whether there is an *inescapable conclusion* that a piece of evidence is being offered to prove statements made outside the courtroom. *See Schaffer,* 777 S.W.2d at 114.

In this instance, we are not inescapably drawn to that conclusion. Lockhart's testimony merely described his investigation of the facts before charging appellant. Thus, the trial court did not err in admitting the testimony, and we overrule points six and seven.

### 2. Geraldo Tape

■ In points twelve through fifteen, appellant complains the trial court erred by admitting an edited transcript from The Geraldo Show. Appellant's argument is predicated on a contention that the evidence was inadequately authenticated. She argues the transcript only reflects the televised portion of her interview, and not the entire interview; therefore, she contends it was improperly authenticated.

■ Again, appellate review of a trial court's ruling on the admissibility of evidence is under an abuse of discretion standard. *See Angleton,* 971 S.W.2d at 67. No abuse of discretion occurs in admitting evidence when the trial court believes that a reasonable juror could find that the evidence has been authenticated or identified. *See, e.g., Jackson v. State,* 968 S.W.2d 495, 499 (Tex.App.—Texarkana 1998, pet. ref'd).

Rule of evidence 901 governs the authentication requirement for the admissibility of evidence and is the only appro-

---

**5.** Most constitutional claims are subject to waiver unless timely presented to the trial court. *See Hawkins v. State,* 964 S.W.2d 767,

769 (Tex.App.—Beaumont 1998, pet. ref'd); *see also Ieppert v. State,* 908 S.W.2d 217, 222 (Tex.Crim.App.1995).

priate analysis for the authentication of recordings. *See* Tex.R. Evid. 901; *Angleton*, 971 S.W.2d at 69. Subsection (a) states that the authentication requirement for admissibility of evidence is satisfied by proof sufficient to support a finding that the matter in question is what its proponent claims it is. *See* Tex.R. Evid. 901(a). Subsection (b) provides a nonexclusive list of methods to authenticate evidence. One example given is the testimony of a witness with knowledge that a matter is what it is claimed to be. *See* Tex.R. Evid. 901(b). Another is "[i]dentification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at anytime under circumstances connecting it with the alleged speaker." Tex.R. Evid. 901(b)(5).

Initially, the State offered a videotape, an audio only recording, and a transcript from the broadcast. However, because of hearsay and concerns of prejudice, the court only admitted portions of the transcript containing appellant's statements.

For authentication purposes, the State offered the affidavit of J. William Reardin, an executive in charge of production and custodian of records for The Geraldo Show. In his affidavit, Reardin stated that the videotape contained the entire content of the broadcast.

In addition, Christine Petrone, a caseworker with DPRS testified that she was familiar with appellant's voice. She testified that on March 5, 1997, she viewed The Geraldo Show in its entirety and recognized appellant's voice as an interviewee. Petrone stated that she was unaware of any alterations in the State's exhibit, and she stated the videotape was a fair and accurate representation of the televised interview.[6]

Turning to the transcript, the record reflects the transcript was prepared by

viewing the videotape. Petrone viewed the videotape on numerous instances and compared the transcript to the videotape. She stated that the transcript fairly and accurately described the statements made by appellant during the broadcast.

Because Petrone viewed the broadcast and testified that the tape was a fair and accurate representation of the broadcast and because she stated that the transcript was a fair and accurate representation of appellant's statements during the interview, her testimony is sufficient to authenticate the transcript. Accordingly, we hold that the trial court did not abuse its discretion in admitting the edited portions of the transcript. We overrule points twelve through fifteen.

### III. CONCLUSION

Because the evidence is legally and factually sufficient and because there was no error during voir dire or in the admission of evidence, we affirm the judgment.

---

6. In addition, the tape is internally consistent and includes time-stamps on certain frames. This is sufficient to establish that the tape has not been altered. *See Angleton*, 971 S.W.2d at 68 (relying on Rule 901(b) example four—contents, internal patterns, and other distinctive features taken in conjunction with the circumstances).