# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-05-00838-CR

**Carmen Mejia, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 167TH JUDICIAL DISTRICT
### NO. 9044057, HONORABLE MICHAEL LYNCH, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Carmen Mejia of (1) felony murder, (2) injury to a child with serious bodily injury, and (3) injury to a child by omission and sentenced her to three life sentences. *See* Tex. Penal Code Ann. §§ 19.02(b)(3) (West 2003), 22.04(a)(1), (b)(1) (West Supp. 2007). In three points, appellant argues that the evidence is legally and factually insufficient to support her conviction for injury to a child by omission and that she was denied due course of law under the Texas Constitution because the State lost exculpatory evidence. We affirm the judgment.

## BACKGROUND

On July 28, 2003, around 1:30 p.m., appellant brought a severely burned 10-month-old baby to the St. David's Hospital Emergency Room. Medical personnel immediately took the

baby, A.C., and began treatment. Later that day, he was transferred to the pediatric intensive care unit of Children's Hospital where he died that night of complications.

Brooke Shertzer, a social worker working at St. David's E.R., spoke with appellant shortly after she brought A.C. into the hospital. Appellant told her that A.C. pulled a pot of boiling water off of the stove onto himself. Shertzer was doubtful of appellant's story, and after consulting with medical personnel who said A.C.'s injuries were not consistent with appellant's explanation of a pot falling, Shertzer called Child Protective Services.

Numerous medical personnel testified as to A.C.'s burns. Dr. Keith Kerr was called to the St. David's E.R. from Children's Hospital to help stabilize A.C. He testified that based on the burn distribution, A.C. must have been held under scalding water, and that the burns could not have resulted from a pot falling because there were no splash burns. When presented with various scenarios such as whether it would be possible for a 2-or 3-year-old child to have accidently caused the injury by trying to give A.C. a bath, Kerr testified that such scenarios were not consistent with A.C.'s injuries. He classified the burn as a deliberate immersion burn, where someone was holding A.C. with his stomach down in the scalding water. Kerr testified that even with such a severe burn, A.C. could have been resuscitated if brought to the hospital sooner. He testified that A.C.'s pH levels were low, indicating prolonged shock and a delay in seeking care for A.C.; for the pH level to get to the level observed, there must have been hours of poor oxygen and poor blood pressure. He opined that if A.C. had been brought in quickly, doctors would have been able to resuscitate him and he would have lived despite scarring and certain physical disability. Kerr testified that due to a prolonged delay in bringing A.C. to the hospital, when he was finally brought in, he was in

2

irreversible shock. In Kerr's opinion, the hours of lost fluid, the stress and shock of the injury, and not receiving immediate medical treatment all led to the baby's death. Dr. James Jackson likewise testified that the injury was older than appellant suggested, explaining that if A.C. had been brought to the E.R. within an hour, as appellant claimed, A.C. would have had more circulating blood volume. Jackson also testified that the chances of resuscitating a patient after an hour are diminished.

Detective Rogelio Sanchez of the Austin Police Department testified that he spoke with appellant shortly before A.C. died. Appellant told him that A.C. had been with her a week and that she was his caretaker during the day while his father worked. Appellant provided Sanchez with various stories as to the cause of the scalding. First appellant told Sanchez that she was heating a bottle for A.C. in a pot on the stove and that he poured the pot on himself. She said she then splashed cold water on him and called her husband. After he got home, she went to Juana Lucas's home to borrow some money for gas before going to St. David's. She said she did not call 911 because there was nobody to watch her children. After Sanchez indicated to her that her story was inconsistent with A.C.'s injuries, appellant then told him that the scalding took place in the bathroom while she was in the bedroom nursing her child. When she finished nursing, she looked for A.C. and found him in the bathroom. She said that her hot water valve in the bathtub leaked, that the tub must have filled up, and that A.C. got into the tub himself. However, A.C.'s father told police that the valve did not leak and that A.C. was not developmentally able to get into the tub himself. Appellant admitted that she lied to her husband when she told him that she was boiling eggs in a pot and that A.C. pulled the pot onto himself. She also admitted telling her friend Juana that A.C. fell into the tub and scalded himself.

3

Appellant then told a new version of the incident. She said A.C.'s father was abusive and that he raped her. After she refused to have sex with him again, he became angry and hurt A.C. She said she did not seek medical treatment because A.C.'s father told her to put some cream on the burn and not to call an ambulance. However, detectives learned that A.C.'s father was at work all day, and after they told appellant that A.C.'s father could not have harmed the baby, appellant gave another version, explaining that her daughter Jennifer, who was 2 or 3 years old at the time, placed A.C. in the bathtub while appellant was nursing her baby in another room. She said she was scared to tell the truth because she feared her children would be taken away.

Phylip Peltier, a retired police officer currently doing consulting and investigations in suspicious burn injury cases, testified that he studied the photos of A.C. He opined that A.C. was held by an adult under his armpits and deliberately submerged. He said scenarios such as a pot of water falling, crawling into tub himself, or being placed in the tub by another young child were implausible because they were inconsistent with A.C.'s injuries. The chief medical examiner for Travis County also testified that the death was a homicide and that appellant's explanation of the child pulling a pot of hot water on himself was inconsistent with the autopsy findings.

Testimony revealed that on the morning of July 28th, around 10 a.m., shortly after the scalding occurred, appellant called her husband. She then went to Elisa Romero, the owner of appellant's duplex, to borrow some money. Romero, upon learning of A.C.'s condition, gave appellant five dollars for gas and told her to call an ambulance. Domingo Diaz, who lived with Romero, testified that Romero told appellant to go to the hospital. Juana Lucas, who lived in the same complex as appellant, testified that appellant came to her house around 11 a.m. asking for help.

4

Juana asked appellant why she had not done anything for A.C. and told her to take him to the doctor. Appellant said she did not know what to do because A.C. did not have Medicaid. Juana told her that the hospital does not charge and offered to call an ambulance, but appellant insisted on taking A.C. to a private doctor. Juana went with appellant to the Family Practice Clinic on Lamar and gave appellant money for gas and milk. When they arrived at the clinic, they were instructed to take the baby to the hospital. Workers for the clinic only briefly saw A.C. wrapped in a blanket. They told appellant to take the child immediately to the E.R. or else he could die. They offered to call an ambulance but appellant insisted she would go herself. She told the clinic staff that she knew where Brackenridge Hospital was located. Appellant then went back home, picked up her husband and other children, and went to St. David's E.R.

Child Protective Services case worker Carol Morin was assigned to appellant's case. She spoke with appellant at the hospital. Appellant told her that she regularly took her children to East Austin Clinic and had taken them before to Brackenridge Hospital. She said she was nursing her youngest child and that Ana, another child, wanted to take a bath. Shortly after, appellant went into the bathroom and pulled A.C. out of the water. She told Morin that Ana got into the bathtub with A.C. but that she was able to jump out. Appellant said A.C. looked a little red but was fine; he was laughing and playing, so she gave him a bottle and he slept. Morin also spoke with appellant's four other children and recommended they be removed from appellant's custody. Teresa Rodriguez, another case worker, visited appellant in jail to update her on her children. Appellant told Rodriguez that she hoped she would get probation, that she was a good person, except that on the day A.C. was injured, "the devil gets in."

5

Detective Sanchez called Kerry Scanlon of the Austin Police Department homicide division after A.C. was brought to the hospital. Scanlon and Detective Robert Merrill went to the duplex where appellant lived to look for the pot and conduct a "burn kit test" on the water in the residence, particularly in the bathtub. Scanlon testified that shortly after A.C.'s death, appellant's three oldest children were interviewed at the Children's Advocacy Center. The interviews were conducted in Spanish and videotaped, then translated into English summaries. Scanlon learned that the videotapes were missing when the defense requested them in preparation for trial. He was aware of what the children said in the videos due to the translation, but he did not view the videos himself. According to the summary, the interviewer turned the videotapes over to a former child abuse unit detective who was no longer with the department and could not be contacted. Scanlon decided to have the children re-interviewed in March 2005 shortly after learning that the videotapes were missing.

At trial, appellant's children testified. In their interviews and during trial, the children never implicated appellant. They gave various stories as to how A.C. got burned; in the interviews, Ana said A.C. burned himself, at trial, she implicated her brother and then her father; Jose said Ana was in the bathroom with A.C.; Jennifer testified that Jose turned on the hot water, but remembered telling the prosecutor that Ana put A.C. in water. The interviewers, both for the original interviews and those conducted after Scanlon learned the videotapes were missing, testified that all the children gave conflicting stories as to what happened.

Appellant testified on her own behalf. She testified that on the morning of July 28, 2003, she was at home with A.C. and her four children and was in the bedroom nursing her

6

youngest when Jennifer told her that Ana was in the bathroom with A.C. She testified that she walked into the bathroom around 9:30 a.m. or 10:30 a.m. and saw A.C. in the tub; she pulled him out and splashed cold water on him. After calling her husband and lying to him about how the baby had been burned, she went to her landlord and borrowed gas money. She then drove to Juana's house and asked for money to take A.C. to the hospital. Appellant asked Juana what to do, and Juana told appellant she knew of a doctor. Appellant claimed that she did not go straight to the hospital because she did not think they would care for a baby without Medicaid. Instead, she went to the Family Clinic around noon but was turned away and told to go to the hospital. Appellant testified that she then went back to her house to look for A.C.'s Medicaid card. After finding his social security card, her husband drove her to the hospital. She admitted lying about how A.C. got burned because she was scared her children would be taken away. She testified that the true story was that her daughter had burned the baby.

## SUFFICIENCY OF THE EVIDENCE

We review the legal sufficiency of the evidence by viewing the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). Although our analysis considers all the evidence presented at trial, we may not re-weigh the evidence and substitute our judgment for that of the fact-finder. *Id.* at 562.

In a factual sufficiency review, we view all of the evidence in a neutral light and will set the verdict aside only if the evidence is so weak that the verdict is clearly wrong and manifestly unjust or the conflicting evidence is against the great weight and preponderance of the evidence.

7

*Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006); *Johnson v. State*, 23 S.W.3d 1, 10-11 (Tex. Crim. App. 2000). Our evaluation may not intrude upon the fact-finder's role as the sole judge of the weight and credibility accorded any witness's testimony. *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). What weight to be given contradictory testimonial evidence is within the sole province of the fact-finder because it turns on an evaluation of credibility and demeanor. *Id.* at 407-09. We must defer appropriately to the fact-finder to avoid substituting our judgment for its judgment. *See Johnson,* 23 S.W.3d at 12.

Under the Texas Penal Code, a person commits an offense if, by her acts, she intentionally, knowingly, recklessly, or with criminal negligence causes bodily injury to a child. Tex. Penal Code Ann. § 22.04(a)(3). A person also commits an offense if, by her omission, she intentionally, knowingly, recklessly, or with criminal negligence causes bodily injury to a child and either has a legal or statutory duty to act or has assumed care, custody, or control of the child. *Id.* § 22.04(b).[1] Injury to a child is a "result of conduct" offense. *Johnston v. State,* 150 S.W.3d 630, 634 (Tex. App. —Austin 2004, no pet.). This means that the culpable mental state relates not to the nature or circumstances surrounding the charged conduct, but to the result of that conduct. *Patterson v. State*, 46 S.W.3d 294, 301 (Tex. App.—Fort Worth 2001, no pet.). The accused must have acted with the requisite culpable mental state to effect the result. *See id.*

The third count of the indictment charged appellant with knowingly causing bodily injury to A.C., by omission, by failing to take him to a medical facility in a timely manner when appellant knew he had been seriously burned. A person knowingly causes a result of her conduct

---

[1] Appellant does not dispute that she had a legal duty to provide A.C. with medical care as he was under her care.

when she is aware that her conduct is reasonably certain to cause the result. Tex. Penal Code Ann. § 6.03(b) (West 2003).[2] Thus, the State had to prove more than that appellant failed to provide medical care for A.C.'s burns; the State had to prove that appellant acted "knowingly" by failing to act with an awareness that a lack of proper medical care was reasonably certain to injure A.C. In other words, the first issue is causation—that A.C. suffered a serious bodily injury as a result of appellant's prolonged failure to seek medical attention. The second issue is mens rea—that appellant knew that a lack of or delay in seeking proper medical care was reasonably certain to injure A.C.

Appellant argues on appeal that the evidence was both legally and factually insufficient to establish her guilt of the offense of injury to a child by omission. Appellant first claims the evidence is insufficient because (1) it was not her conscious objective or desire to cause serious bodily injury through the small delay in getting A.C. medical care, and (2) she sought medical care for A.C. within two and a half hours of the scalding incident. However, the State was not required to prove that appellant had a conscious objective or desire to cause serious bodily injury through delaying medical treatment. Appellant was indicted and convicted of injury to a child by omission with a "knowing," not an "intentional," mens rea.[3] Further, the evidence reveals that the incident occurred shortly before 10 a.m., but appellant did not arrive at St. David's E.R. until

---

[2] Knowledge can be inferred by the fact-finder from the defendant's acts, words, or conduct. *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002).

[3] A person intentionally causes a result of her conduct when it is her conscious desire to cause the result. Tex. Penal Code Ann. § 6.03(a) (West 2003). In contrast, a person knowingly causes a result of her conduct when she is aware that her conduct is reasonably certain to cause the result. *Id.* § 6.03(b).

around 1:30 p.m. Thus, at least three hours passed between the incident and appellant's obtaining medical help for A.C.[4]

Appellant also challenges both the evidence to prove causation (that A.C. suffered bodily injury because appellant failed to provide him timely medical care) and mens rea (that appellant was aware that her omission would cause serious bodily injury).

As noted above, the State had to prove more than that A.C. suffered a serious bodily injury because appellant failed to provide him medical care. In addition, the State had to prove that appellant was aware that her omission in obtaining medical care would be reasonably certain to cause injury. *Dusek v. State*, 978 S.W.2d 129, 134 (Tex. App —Austin 1998, pet ref'd). The evidence at trial was sufficient to support the finding that appellant's delay in providing A.C. medical care caused his death. Dr. Jackson testified that the injuries were older than an hour and that the chances of resuscitating a patient after an hour are diminished. Similarly, Dr. Kerr testified that the delay in seeking care for A.C. caused irreversible harm and contributed to his death. He testified that A.C. was in irreversible shock due to the delay and noted that if A.C. had been brought to the hospital right away, he would have had permanent damage but would have survived. Overall, Kerr believed that the sustained lack of resuscitation due to the delay in treatment led to A.C.'s organ failure and his death.

Dr. Kerr also testified that an adult who saw A.C. soon after he had been burned would know (1) that he had been seriously burned, (2) that he needed to be taken to a medical facility in a timely manner, and (3) that if he were not taken to a facility to receive timely medical care, it

---

[4] Appellant testified that the incident occurred at "10:30 [a.m.], 9:30 [a.m]" and that she arrived at the E.R. at 1:30 p.m. She also testified that she called her husband right after A.C. was burned and agreed that records indicate she called him at 10:09 a.m.

would be reasonably certain that he would suffer serious bodily injury. Similarly, when appellant went to see Juana, Juana expressed concern about why appellant had not done something yet and suggested appellant call an ambulance, assuring her that even without a Medicaid card, A.C. would be treated at the hospital. The Family Clinic staff workers testified that they told appellant that A.C. could die if not treated soon; they even offered to call an ambulance for appellant, but she declined. Appellant knew about A.C.'s injuries but failed to seek medical care when she knew he needed it because A.C. lacked insurance. Appellant knew what 911 was for and how to dial it and had a phone available. She also knew where Brackenridge Hospital was located. Appellant gave inconsistent statements to police about why she failed to get A.C. immediate medical treatment—no one was there to watch her other children, A.C. did not have Medicaid, A.C.'s father told her not to call an ambulance, and she wanted to go to a private doctor. The jury had sufficient basis for concluding that appellant's actions illustrate that she knew the seriousness of A.C.'s injuries and that immediate medical attention was necessary.

In her brief, appellant claims that her delay was not lengthy enough to uphold the conviction. She cites to cases in which courts upheld convictions for injury to a child by omission based on a lengthy delay in obtaining medical treatment, and to one case in which the court reversed a conviction. *See Patterson,* 46 S.W.3d at 294 (appellant could hear child's screams and did not call 911 for more than 6 hours); *Thorton v. State*, 994 S.W.2d 845 (Tex. App.—Fort Worth 1999, pet. ref'd) (blood flow cut off for several days before appellant sought medical treatment). However, these cases are distinguishable. Appellant took over three hours to get to St. David's E.R. despite repeatedly being told that the baby needed immediate attention and that she should call an

11

ambulance. Unlike in *Johnson* or *Dusek*, appellant's delay caused further injury to the child as Dr. Kerr testified the prolonged delay sent A.C. into irreversible shock. *See Johnson v. State*, 121 S.W.3d 133 (Tex. App.—Fort Worth 2003, pet. ref'd) (delay due to defendant driving instead of calling 911 not unreasonable as she had just moved from city where it was faster to drive to hospital instead of waiting for ambulance, and doctor testified that blood loss that caused death would not have been readily apparent); *Dusek*, 978 S.W.2d at 133 (defendant's conviction reversed because no evidence that defendant's failure to seek medical care caused broken leg or aggravated the seriousness of injury). While the lack of medical care did not cause the burn, significant evidence showed that the burn resulted from a forcible immersion and that the delay in getting proper medical care aggravated A.C.'s injury and ultimately led to his death. Furthermore, the evidence shows that appellant was aware of A.C.'s serious medical condition, his need for immediate medical care, and that without immediate medical assistance, A.C. could die. *See Johnston v. State,* 150 S.W.3d 630, 634 (Tex. App.—Austin 2004, no pet.) (defendant's intent in delaying medical care to hide abuse, rather than cause harm, also showed need to take victim to hospital).

Viewing the evidence in the light most favorable to the verdict, the evidence is legally sufficient to support the jury's verdict. Moreover, when viewed in a neutral light, the evidence is also factually sufficient. Resolution of any inconsistencies in testimony is left to the fact-finder. *Cain*, 958 S.W.2d at 408. Similarly, contradictions between witnesses' statements are resolved by the fact-finder's determination of credibility. *Id.* Accordingly, the evidence supporting the judgment is not so weak as to be manifestly unjust and clearly wrong. Therefore, we hold that the evidence is legally and factually sufficient to support the judgment and we overrule points one and two.

## LOST EVIDENCE

In her third point, appellant claims she was denied due course of law under article I, section 19 of the Texas Constitution when the State lost the videotapes of the interviews with appellant's children made the day after A.C. died. Appellant argues that although she is unable to prove the State acted in bad faith, the loss of the evidence is nonetheless so critical to the defense as to make the trial fundamentally unfair.

The State has a duty to preserve favorable, material evidence, which is evidence that (1) has an exculpatory value that is apparent before the evidence is destroyed, and (2) is of such a nature that the defendant would be unable to obtain comparable evidence by any other reasonably available means. *California v. Trombetta,* 467 U.S. 479, 488-89 (1984); *Jackson v. State*, 50 S.W.2d 579, 588-89 (Tex. App.—Fort Worth 2001, pet. ref'd). Therefore, a defendant must demonstrate the lost evidence is both favorable and material to her case. *Jackson,* 50 S.W.2d at 589. A showing that the lost evidence might have been favorable does not satisfy the materiality standard. *Id.* In addition, the accused must show that the State acted in bad faith when it failed to preserve the evidence in order to show a violation of due process or due course of law. *Id.* (citing *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988)); *Burke v. State*, 930 S.W.2d 230, 236 (Tex. App.—Houston [14th Dist.] 1996, pet. ref'd).

Appellant notes that the videotapes were potentially exculpatory evidence, but a showing that lost evidence *might have been* favorable is not sufficient. *See Jackson*, 50 S.W.2d at 588-89. Appellant must make an affirmative showing that the evidence was favorable and material. *Gamboa v. State*, 774 S.W.2d 111, 112 (Tex. App.—Fort Worth 1989, pet. ref'd).

13

Furthermore, comparable evidence was available. Written summaries of the videotapes were made and provided to appellant. The interviewers and the children were available for questioning and the children were re-interviewed. Appellant claims the videotapes could have exculpated her because none of the children implicated her in A.C.'s scalding. However, this same information was available in the written summaries of the first interviews and was elicited at trial through the testimony of the children and the interviewers. *See Hebert v. State*, 836 S.W.2d 252, 254 (Tex. App.—Houston [1st Dist.] 1992, pet. ref'd) (comparable evidence available in the form of written transcript and child's previous testimony, and child and interviewer were available for questioning).

Additionally, appellant has not demonstrated that the State acted in bad faith. Indeed, appellant acknowledges that she cannot prove bad faith on the part of the State. However, appellant argues that it is often impractical for a defendant to prove bad faith, and therefore, that some states are moving away from the *Youngblood* standard and finding that their own state constitutions provide stronger due process protections than the United States Constitution. Other than citing cases that employ a balancing test rather than the *Youngblood* standard, appellant has offered no explanation of how the protection offered by the Texas Constitution differs from the protection guaranteed by the United States Constitution. Among these cases, most relax the bad-faith requirement—the hardest element to establish[5]—if the defendant can prove that the loss of the

---

[5] *See State v. Ferguson*, 2 S.W.3d 912, 917 (Tenn. 1999) (finding that proving bad faith is extremely difficult).

14

evidence is so critical to the defense as to make the trial fundamentally unfair.[6]  Regardless, comparable evidence was available, and appellant has not shown that the lost evidence was exculpatory.  We overrule appellant's third point.

## CONCLUSION

We affirm the judgment of the trial court.

_____

David Puryear, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed:   May 29, 2008

Do Not Publish

---

[6] *See, e.g., Ex parte Gingo*, 605 So. 2d 1237, 1241 (Ala. 1992) (adopting *Youngblood* with a "Stevens" exception: no showing of bad faith required if the loss or destruction of the evidence is so critical to the defense as to make a criminal trial fundamentally unfair); *Thorne v. Department of Pub. Safety*, 774 P.2d 1326, 1330-31 (Alaska 1989) (balancing test); *Williams v. State*, 50 P.3d 1116, 1126 (Nev. 2002) (defendant must prove bad faith or undue prejudice); *State v. Cheeseboro*, 552 S.E.2d 300, 307 (S.C. 2001) (adopting *Youngblood* with an exception if defendant cannot obtain other evidence of comparable value).

15