NUMBER 13-09-00587-CR



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 

 

ANTHONY SAMORA A/K/A ANTHONY

"TANK" JACOB SAMORA, Appellant,


v.

 

THE STATE OF TEXAS, Appellee.

 


On appeal from the 214th District Court

of Nueces County, Texas.

 


 MEMORANDUM OPINION

 

Before Chief Justice Valdez and Justices Yañez and Garza


 Memorandum Opinion by Chief Justice Valdez
 

 Appellant, Anthony Samora a/k/a Anthony "Tank" Jacob Samora, was charged by
indictment with injury to a child, a first-degree felony. See Tex. Penal Code Ann. §
22.04(a), (c)(1), (e) (Vernon Supp. 2009). After a bench trial, the trial court found Samora
guilty of the underlying offense and sentenced him to fifty years' incarceration in the
Institutional Division of the Texas Department of Criminal Justice. By three issues, Samora
challenges the legal and factual sufficiency of the evidence supporting his conviction and
argues that the trial court erred in overruling a hearsay objection that allowed the State to
introduce evidence of Samora's prior bad acts. We affirm. 

I. Background

 The indictment in this case provided that on or about January 3, 2009, Samora
"intentionally or knowingly cause[d] serious bodily injury to [B.W. (1)], a child 14 years of age
or younger, by rolling or throwing or hitting . . . or by manner and means unknown to the
Grand Jury." As a result of this incident, the child victim, B.W., then two years old,
sustained twenty-nine visible injuries to her body and numerous injuries to her brain, which,
after multiple surgeries, required a resection or removal of fifty percent of her brain. 
Samora waived his right to a jury trial, and a bench trial commenced. 

A. The State's Evidence

 Tanya Flores, a detective with the family violence division of the Corpus Christi
Police Department, testified that she first made contact with Samora at the Driscoll
Children's Hospital ("Driscoll") in Corpus Christi, Texas, on the morning that B.W. was
injured. Detective Flores stated that B.W. was brought to the Driscoll emergency room by
B.W.'s mother, Katlyn Webb, at around 6:30 a.m. on January 3, 2009. Detective Flores
noted that Samora did not accompany Webb to the hospital and that he arrived at the
hospital at approximately 11:45 a.m. or noon. Later, Samora gave Detective Flores
permission to investigate his residence, and he voluntarily gave two recorded statements,
both of which were entered into evidence. 

 In his first statement, Samora acknowledged that he had arrived home around 3:30
a.m. on January 3, 2009, after attending a party with his cousins. Once he arrived home,
Webb, who usually stayed at Samora's residence, went to get food at the local
Whataburger while Samora changed his clothes, leaving B.W. in Samora's sole custody. 
Samora alleged that it only took Webb fifteen minutes to get the food and that at some
point in time, he heard B.W. start "gagging or choking." Webb, who was now home, and
Samora went to tend to B.W. and noticed that B.W. was not breathing right. Samora
recalled that Webb gave B.W. a couple of "rescue breaths" to help her breathe. The
couple noticed that B.W.'s shirt was wet and surmised that B.W. had recently vomited. 
Samora also noted that B.W. appeared to be in and out of consciousness, so the couple
put B.W. in the shower in an attempt to wake B.W. up; however, the couple's efforts were
unsuccessful. Rather than immediately take B.W. to the emergency room for medical care,
the couple waited several hours to see if B.W.'s condition would improve. Eventually,
Webb took B.W. to the hospital. Samora tried to explain the various visible injuries on
B.W. by claiming that he was "holding [B.W.] tight" when B.W. was limp in the shower. He
also claimed to have seen a mark on B.W.'s eye and other marks on her body, but he
explained that the marks were likely caused by B.W. rubbing her eyes and scratching or
biting herself while she was sick.

 In his second statement to police, Samora admitted that more had happened on the
night in question than he revealed in his first statement. Samora told police that on the
night of the incident, he played with B.W. by rolling her in a blanket even though Samora
admitted that he and B.W. were not "real close." (2) Samora also noted that he asked B.W.
if she wanted to go to bed but she said "no" and that she wanted to watch television at 3:30
a.m. At some point during the interview, one of the investigators referenced B.W.'s head
injury and stated, "I don't think you intended to hurt her when you did that," to which
Samora responded by shaking his head side to side. Despite this, Samora denied knowing
the cause of B.W.'s injuries. Samora tried to explain that scratches discovered on B.W.'s
neck were caused by a dog that was playing with B.W.

 Nancy Harper, M.D., the medical director for the Child Abuse and Resource
Evaluation team at Driscoll, testified that B.W. had petechiae, which are small broken blood
vessels, on her forehead and around her eyes, which are commonly caused by "chest
compressions, strangulation, choking, [or] asphyxiation of a child." Dr. Harper also noted
that B.W. had several abrasions on her chin and neck and several abnormal bruises on her
lower abdomen, chest, and hand. Dr. Harper recalled that B.W. also had an injury to the
nail on one of her middle fingers and a lot of swelling and bruising at the bottom of her left
index finger. Dr. Harper also saw lots of bruising on the top and inside of B.W.'s right ear. 
When asked about B.W.'s ear injuries, Dr. Harper stated that "[e]ar bruising is just not seen
commonly in children just from any sort of normal accidents. This is what you see when
there's been direct impact or trauma such as like boxing the ears or impact against a flat
surface. You can also see it when ears are grabbed . . . ." Dr. Harper testified that "there's
not a lot of good science behind dating bruises." 

 Dr. Harper then recounted a conversation she had with Webb regarding B.W.'s
health history. (3) Webb told Dr. Harper that B.W. was a "pretty normal developmentally
appropriate two-year-old child" who had some issues with asthma. Webb reported that she
had previous problems with anemia and that she bruised easily, but that no other people
in her family had bleeding disorders that required treatment. Webb further noted that
around 3:45 a.m. on the morning of the incident, B.W. was unconscious and was breathing
irregularly. Dr. Harper testified that those are symptoms of a child with a serious deep
brain injury and that those symptoms generally occur within minutes, not hours, of the
severe brain injury. Dr. Harper further testified that another physician's opinion that the
brain injury occurred some eight to twelve hours prior to the time B.W. was admitted to the
hospital--6:23 a.m.--was based on an initial CAT scan and was inconsistent with the injury
that was actually found when B.W. underwent brain surgery. In addition, Dr. Harper stated
that:

 For instance, when a child falls, you know, they might have a single
plane of injury from where they contacted a surface. Sometimes we see a
skull fracture. Maybe we see no skull fracture and might see a small
subdural. We may see some bruising on the scalp. But generally they don't
have that sort of deeper brain injury. They don't have impaired
consciousness, problems with their breathing and circulation. Generally,
they do fine, very well in fact. 

 . . . .

 

 What [was most] compelling to me was the extent of the injuries to
[B.W.'s] head. There was [sic] more than six or eight impact sites to her
head. She had what looked like marks, you know, around her eyes from say
strangulation. She had extensive brain injury, extensive retinal hemorrhages,
and just life threatening symptoms that we just really see when children have
had inflicted trauma to their brains. 

 The State next called Ramiro Hernandez Jr. to testify; however, before Hernandez
took the stand, Samora objected to any testimony that Hernandez may offer as
impermissible testimony about extraneous bad acts and argued that the State had not
provided proper notice of its intent to use Hernandez's testimony at trial. The State
countered Samora's objection by arguing that Hernandez's testimony went to the intent
element of the offense and did not constitute inadmissible extraneous-bad-act testimony. 
The trial court overruled Samora's objection, and Hernandez was allowed to testify.

 Hernandez testified that he had known Samora for five or six years and that during
the time in question, he lived with Samora. Hernandez recalled several incidents where
Samora mistreated B.W. Hernandez stated that B.W. was scared of Samora and that
Samora repeatedly complained about B.W. crying "for no damn reason." Hernandez
remembered Samora putting a lit cigarette in B.W.'s mouth and an incident where B.W.'s
urine-filled diaper leaked onto Samora's shirt and Samora responded by getting "pissed
off" and calling B.W. a "f'ing nigger baby." (4) Hernandez testified that Samora called B.W.
a "nigger baby" all the time and that Samora would put a comforter on B.W.'s head to make
her fall down. (5) 

 On cross-examination, Samora's trial counsel attempted to draw a distinction
between the terms "nigga" and "nigger" by elucidating testimony from Hernandez that the
term "nigga" is used to refer to friends, while the term "nigger" is derogatory. Hernandez
admitted that he and his friends regularly called each other "nigga" as a term of
endearment. On re-direct examination, Hernandez acknowledged that Samora would
regularly hit B.W. in the back of the head and say, "what's up, nigga baby." Hernandez
also testified that Samora desired to be an Ultimate Fighting Championship fighter or
boxer. 

 Corina Samora, Samora's mother who also lived at the residence, testified that she
had a good relationship with B.W., even though B.W. was not Samora's child and that, on
the night in question, she took B.W. to a laundromat, a local Stripes convenience store,
and McDonald's. Corina stated that B.W. had some "red bruising and blood clotting" on
her ear and was fussy at this time but that, generally speaking, B.W. appeared to be in
good health. Security camera footage obtained from the Stripes convenience store
revealed that B.W. was walking and talking. After leaving the convenience store, Corina
took B.W. to McDonald's to get some chicken nuggets; however, B.W. only took a few
bites and then refused to eat. Corina was concerned about B.W.'s health at this time but
chose not to take her to the doctor or the hospital. Corina returned to the residence with
B.W. at 7:00 p.m. on January 2, 2009. Corina acknowledged that B.W. was afraid of
Samora and that Samora often called B.W. a "nigga baby" in a joking manner. Corina also
testified that Samora was not a racist because he had African-American friends and
because he had previously dated an African-American woman. Corina denied ever hurting
B.W. and concluded her testimony by noting that Samora was good with children. (6)

 Webb stated that she did not have primary custody of B.W., but that she and B.W.
occasionally stayed at Samora's residence. Webb recalled that B.W. and Samora were
not close and that B.W. was scared of Samora. In fact, Webb told B.W. that she was
going to tell Samora when B.W. misbehaved and B.W. immediately would stop crying. 
Webb remembered seeing Samora hit B.W. on the back of the head and call her "little
nigger baby." Webb noted that Samora was aware that B.W. was scared of him, but
Samora would pick B.W. up anyway. Webb acknowledged that Samora would throw B.W.
up in the air and catch her, even though B.W. cried and was scared. With respect to the
incident where B.W.'s diaper leaked onto Samora's shirt, Webb testified that, after the
incident, Samora took his shirt off and threw the urine-soaked shirt at B.W. Webb then
took the shirt off B.W. and set it aside. Samora then picked the shirt up and threw it at
Webb, imploring her to smell the shirt because "it's your daughter's pee." Webb further
testified that Samora would call B.W. a "nigger baby" regularly and that he placed
cigarettes in B.W.'s mouth. However, Webb denied that the cigarettes were ever lit
because the lighter in the house did not work. 

 Regarding the night in question, Webb noted that B.W. was congested and was
coughing, as she was battling a cold. Webb also noted that B.W. did not have much of an
appetite that night, but, other than the cold and loss of appetite, B.W. was "okay." Webb
recalled that, on the night in question, she was in Aransas Pass, Texas, until around 10:30
p.m., when she returned to the residence to check on B.W. Webb noticed that B.W. was
asleep with Corina, so Webb took B.W. to the room that Webb shared with Samora and
put B.W. back to sleep. Webb did not remember B.W. saying anything at this point. B.W.
just looked around and went back to sleep. Webb then went to watch television in the
living room until she retired to the room where B.W. was sleeping at 1:18 a.m. 

 At 3:48 a.m., Samora returned to the residence and woke Webb up. Samora told
Webb to wake up because they were going to watch a movie. He also instructed Webb
to go get them something to eat at Whataburger. Webb complied. Upon returning to the
residence approximately fifteen or twenty minutes later, Webb noticed that the front door
and the door to Samora's bedroom were locked, even though Webb had not locked either
door when she left. When Webb tried to enter the bedroom, Samora asked, "Katlyn, is that
you," to which Webb responded, "yes." Samora then let Webb in and left the room. Webb
looked over to see if B.W. was still asleep. Webb noticed that B.W. was facing a different
direction while sleeping, but was not overly concerned about B.W., so she went to the living
room to eat their food. A couple of minutes later, Webb heard B.W. coughing and went
to the room to check on B.W. Webb patted her on the back, and Samora entered the room
and told Webb to try to get B.W. to "spit some of that stuff up because it sounds ugly." 
When Webb tried to sit B.W. up, B.W. was unresponsive, and Webb began to panic. 
Webb then recounted:

 We were patting her back . . . . She was coughing, and she kind of
was like pushing us away. She ended up throwing up. And then I noticed
her getting stiff and like having kind of like seizures, and then she threw up
a second time. Then she would act like she wasn't responsive, and I would
get scared. But then she would start being responsive again. It was like off
and on. 

Webb testified that Samora helped her try to revive B.W., but that the couple decided not
to call 911 at this point because they were scared and did not know what to do. They tried
putting B.W. in the shower next, but B.W.'s condition did not improve. After several hours
of trying to revive B.W., Webb finally took B.W. to the hospital. Webb could not explain
why Samora did not accompany them to the hospital, but she did remember arriving at the
hospital around 6:02 a.m. on January 3, 2009. Webb admitted that she repeatedly spoke
to Samora via her cell phone while at the hospital and that, when asked by a social worker
at the hospital, she identified Samora as Anthony Canales, the last name of Samora's
stepfather and a name that Samora never used. 

 When asked about B.W.'s injuries, Webb remembered seeing four small bruises on
B.W.'s back when they put B.W. in the shower on the night of the incident. Later, Webb
recounted that B.W. also had bruising on her ears when she moved B.W. from Corina's
room to the bedroom. (7) Webb testified that Samora would color with B.W. and play with her
on occasion. Webb then admitted to not telling social workers everything that had
transpired or about all of Samora's interactions with B.W. because she never saw him
actually physically hurt B.W. Webb admitted that Samora bit B.W. on her arm and left
bruises a couple of times when the two were playing. 

 On cross-examination, Webb denied ever giving B.W. chest compressions and
noted that, when Samora would call her cell phone while she was at the hospital, he would
always ask who Webb had talked to and what had transpired. (8) Webb denied trying to
protect Samora even though the two have continued their relationship while both are in
custody. She further stated that she used the false name to identify Samora in an effort
to not involve him. (9)

 Webb later recounted that social workers at the hospital accused her of changing
her story several times, but she explained that the inconsistencies in her story were due
to a faulty memory and the social workers forcing her to guess about what had happened
to B.W. Webb also admitted that she "felt weird" leaving B.W. in Samora's sole custody
while she went to Whataburger. 

 Michael Burke, M.D., the pediatric neurosurgeon at Driscoll who operated on B.W.'s
brain, testified that B.W. would have become symptomatic the second the injuries to her
brain occurred. He further testified that it was his opinion that B.W.'s brain injuries were
caused by the physical abuse by another person and that a single blow to the head would
not have caused the injuries B.W. sustained. At one point in his testimony, Dr. Burke
compared B.W.'s brain injuries to those one would suffer if ejected from a car in a sixty-five-mile-per-hour-rollover accident. Like Dr. Harper, Dr. Burke disagreed with notes made
by another doctor at Driscoll that B.W.'s brain injuries occurred approximately eight to
twelve hours prior to checking in at the hospital. Dr. Burke then testified, without objection,
as to the following: "Yes, I know who did it, based on their own history. I took a history. 
The mother [Webb] and Anthony [Samora] were present with the child when the child
became symptomatic. The injuries will become symptomatic immediately. The mother
and/or Anthony did this." 

B. Samora's Evidence

 Samora called four witnesses--Kristi Escamilla, Robert Rodriguez, Jacob Galvan,
and Eric Flores--to testify on his behalf. Each testified that they were friends with Samora
and had known him for several years. Several of the witnesses stated that they have
children, and that Samora was good to their children. The witnesses recounted instances
when Samora would play with their children and stated that Samora interacted positively
with several African-Americans with whom he came in contact. Several of the witnesses
testified that Hernandez did not have a reputation in the community for being truthful and
that the friends often called each other "nigga" as a term of endearment.

 After both parties rested, the trial court found Samora guilty of the first-degree
offense of injury to a child and subsequently sentenced him to fifty years' incarceration in
the Institutional Division of the Texas Department of Criminal Justice. Samora filed a
motion for new trial and a motion in arrest of judgment, both of which were overruled by
operation of law. See Tex. R. App. P. 21.8(a), (c). This appeal followed. 

II. Samora's Objections to Detective Flores's Testimony

 By his second issue, Samora asserts that the trial court erred in overruling his
objection to a portion of Detective Flores's testimony. Specifically, Samora complains that
Detective Flores's statements regarding Samora's failure to immediately come to the
hospital to attend to the child constitute inadmissible hearsay because Detective Flores
lacked personal knowledge about when Samora showed up to the hospital. See Tex. R.
Evid. 802 (providing that hearsay testimony is not admissible unless allowed by statute or
an exception to the hearsay rule). Samora contends that this evidence "was harmful" and
"created an important link early in the trial as it tended to show the guilt of the defendant
from the outset of the case." The State counters by arguing that Samora failed to preserve
this issue because Samora's trial counsel did not obtain a ruling on his hearsay objection. 
The State further argues that error, if any, in the admission of Detective Flores's
statements was harmless because it was cumulative of other uncontroverted testimony
offered at trial. 

 Samora's second issue centers on the following exchange between Detective Flores
and the State:

 [The State]: Do you know how long the child had been at Driscoll
[Children's Hospital] before the Defendant arrived at the
hospital? 

 [Detective Flores]: I know that [B.W.] was brought in about 6:30 in the
morning. I got there between 10:45 and 11:00, and he
[Samora] probably arrived maybe an hour later.

 [The State]: Was it your understanding based on your preliminary
investigation there at Driscoll that he had not been
present until the time he arrived?

 [Defense counsel]: Your Honor, I'm going to object. That calls for hearsay
and lack of personal knowledge.

 [The State]: Your Honor, I'm asking not what somebody said but
what she was able to ascertain when she made contact
with people at Driscoll.

 [Defense counsel]: That would not be based on her personal knowledge,
Your Honor. 

 [The Court]: Just rephrase and let me hear that.

 [The State]: Were you able to determine whether or not the
Defendant had been at the hospital prior to the time that
you saw him?

 [Detective Flores]: Yes. 

 [The State]: And had he been there?

 [Detective Flores]: No.

 [Defense counsel]: Your Honor, same objection.

 [The State]: When you first made contact with the Defendant, was
it immediately upon his arrival there at the hospital?

 

 [Detective Flores]: Yes. 

 As noted above, Samora objected to the State's line of questioning regarding when
Samora arrived at the hospital, asserting that Detective Flores's statements constituted
inadmissible hearsay. See id. The trial court ostensibly sustained Samora's objection by
requesting that the State rephrase the question. The State rephrased, and Samora, once
again, lodged a hearsay objection. See id. However, Samora did not obtain a ruling from
the trial court on his objection to the rephrased question. 

 In order to preserve error for appellate review, Texas Rule of Appellate Procedure
33.1(a) requires a party to: (1) present a timely objection; (2) state the specific grounds for
the objection; and (3) obtain a ruling. Tex. R. App. P. 33.1(a); see Lopez v. State, 253
S.W.3d 680, 684 (Tex. Crim. App. 2008) (citing Geuder v. State, 115 S.W.3d 11, 13 (Tex.
Crim. App. 2003)). (10) Here, Samora did not obtain a ruling from the trial court on his
objection to the rephrased question. 

 Nevertheless, even if Samora had preserved this issue for appellate review, we
conclude that the trial court's admission of the complained-of statements was harmless
because: (1) Detective Flores offered substantially similar testimony at the beginning of
the highlighted exchange--Samora arrived at the hospital approximately one hour after
Detective Flores's 10:45 a.m. or 11:00 a.m. arrival--that was not objected to, see Lane v.
State, 151 S.W.3d 188, 193 (Tex. Crim. App. 2004) (stating that "'[a]n error [if any] in the
admission of evidence is cured where the same evidence comes in elsewhere without
objection'"); and (2) Detective Flores's statements merely recounted the particulars of her
investigation into the incident and how Samora became a suspect, which is admissible at
trial. See Lee v. State, 29 S.W.3d 570, 577 (Tex. App.-Dallas 2000, no pet.) ("Police
officers may testify to explain how the investigation began and how the defendant became
a suspect.") (citing Dinkins v. State, 894 S.W.2d 330, 347 (Tex. Crim. App. 1995); Short
v. State, 995 S.W.2d 948, 954 (Tex. App.-Fort Worth 1999, pet. ref'd); Thornton v. State,
994 S.W.2d 845, 854 (Tex. App.-Fort Worth 1999, pet. ref'd)). Accordingly, we overrule
Samora's second issue. 

III. Evidence of Samora's Prior Bad Acts

 By his third issue, Samora argues that the trial court erred in allowing into evidence
information about Samora's alleged prior bad acts in violation of Texas Rules of Evidence
403 and 404. See Tex. R. Evid. 403, 404. Specifically, Samora complains about the
admission of witness testimony from Hernandez and Webb chronicling his alleged
treatment of B.W. The State argues that Samora's objections to the complained-of
evidence were premature and, therefore, did not preserve this issue for appellate review. 
The State also argues that Samora waived his right to notice of such evidence because
he did not obtain a ruling from the trial court on his discovery request brought pursuant to
article 38.37 of the code of criminal procedure and that error, if any, was harmless because
Samora has not made a showing of, nor does the record reflect, harm flowing from the
admission of the evidence. See Tex. Code Crim. Proc. Ann. art. 38.37 (Vernon Supp.
2009).

A. Standard of Review and Applicable Law

 We review a trial court's admission of extraneous offense evidence under an abuse
of discretion standard. Powell v. State, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001). A trial
court abuses its discretion if its ruling is outside the zone of reasonable disagreement. Id.;
see Casey v. State, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007). "An appellate court
would misapply the appellate abuse of discretion standard of review by reversing a trial
court's admissibility decision solely because the appellate court disagreed with it." Powell,
63 S.W.3d at 438.

 1. Texas Rule of Evidence 404(b)

 Pursuant to rule 404(b), evidence of other crimes, wrongs, or acts is inadmissible
"to prove the character of a person in order to show action in conformity therewith." Berry
v. State, 233 S.W.3d 847, 858 (Tex. Crim. App. 2007); see Tex. R. Evid. 404(b). However,
such evidence is admissible if offered for another purpose, such as proof of motive,
opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or
accident. Tex. R. Evid. 404(b); see De La Paz v. State, 279 S.W.3d 336, 342-43 (Tex.
Crim. App. 2009). 

 2. Texas Code of Criminal Procedure Article 38.37 

 Article 38.37, section 2 of the code of criminal procedure provides, with respect to
certain crimes committed against children under seventeen years of age, that:

 Notwithstanding Rules 404 and 405, Texas Rules of Evidence, evidence of
other crimes, wrongs, or acts committed by the defendant against the child
who is the victim of the alleged offense shall be admitted for its bearing on
relevant matters, including:

 (1) the state of mind of the defendant and the child; and

 (2) the previous and subsequent relationship between the defendant
and the child. 

Tex. Code Crim. Proc. Ann. art. 38.37, § 2. Article 38.37, section 3, however, requires the
State to give the defendant notice of its intent to use such evidence in its case-in-chief
upon a timely request by the defendant and in the same manner as required by Texas Rule
of Evidence 404(b). Id. § 3.

B. Hernandez's Testimony

 As noted earlier, Samora complained about Hernandez's testimony before
Hernandez even took the stand, making procedural and substantive objections. At that
time, it was not entirely clear as to what Hernandez would testify to, and, as the State
asserts, Samora's "objection did not specify any certain, identifiable incidents, but merely
attempted to prevent Hernandez from testifying at all." In addition, as part of his pre-emptive procedural objection to Hernandez's testimony, Samora complained about the
State's alleged failure to provide notice of its use of Samora's extraneous bad acts at trial. 

 1. Notice of Hernandez's Testimony Regarding Prior Bad Acts

 The record reflects that Samora requested notice of the State's intent to use
evidence of Samora's extraneous bad acts at trial under, among other things, rule 404(b)
of the rules of evidence and article 38.37 of the code of criminal procedure. See Tex. R.
Evid. 404(b); see also Tex. Code Crim. Proc. Ann. art. 38.37. Samora's objection at trial,
however, did not comport with his previously-filed request for notice. Samora notified the
trial court that the State had failed to provide him notice of the extraneous bad acts, but
Samora did not explicitly ask the trial court to rule on his article 38.37 request for notice of
extraneous bad acts. Samora's failure to make a specific request to the trial court under
article 38.37, and his failure to obtain a ruling on such a request, waives the article 38.37
notice requirement. See Tex. R. App. P. 33.1(a); Espinosa v. State, 853 S.W.2d 36, 38-39
(Tex. Crim. App. 1993) (per curiam) ("[W]hen a defendant relies on a motion for discovery
to request notice . . . it is incumbent upon him to secure a ruling on his motion in order to
trigger the notice requirements of that rule."); see also Mitchell v. State, 982 S.W.2d 425,
427 (Tex. Crim. App. 1998) (holding that when a request asks the trial court to enter an
order and asks the State to provide notice, the request is insufficient to trigger the duty to
provide notice). As such, we conclude that Samora failed to trigger the notice requirement
of article 38.37, and therefore, the trial court did not err in denying Samora's objection with
respect to lack of notice. See Espinosa, 853 S.W.2d at 38-39; see also Mitchell, 982
S.W.2d at 427. Moreover, Samora's appellate arguments center on rule 404(b) of the rules
of evidence, and, as stated earlier, article 38.37 allows for the introduction of such
evidence "[n]otwithstanding Rules 404 and 405, Texas Rules of Evidence"; thus, we need
only analyze the trial court's admission of testimony chronicling Samora's prior bad acts
under article 38.37. See Tex. R. App. P. 47.1; see also Tex. Code Crim. Proc. Ann. art.
38.37. 

 2. Samora's Substantive Objection to Hernandez's Testimony

 The substantive portion of Samora's pre-emptive objection to Hernandez's
testimony complained that testimony regarding his extraneous bad acts was irrelevant and
highly prejudicial within the context of rule 403. See Tex. R. Evid. 403. However, we note
that, to preserve error, an objection must be timely. See Tex. R. App. P. 33.1(a)(1). To be
considered timely, the objection must be made at the first opportunity or as soon as its
basis becomes apparent. See Dinkins, 894 S.W.2d at 335; Wilson v. State, 44 S.W.3d
602, 606 (Tex. App.-Fort Worth 2001, pet. ref'd); see also Moore v. State, No. 01-05-00536-CR, 2006 Tex. App. LEXIS 9945, at **6-7 (Tex. App.-Houston [1st Dist.] Nov. 16,
2006, pet. ref'd) (mem. op., not designated for publication). Several Texas courts have
held, in unpublished opinions, that premature objections do not preserve error for appeal. 
See, e.g., Moore, 2006 Tex. App. LEXIS 9945, at *7; Riley v. State, No. 10-02-202-CR,
2003 Tex. App. LEXIS 10877, at **2-3 (Tex. App.-Waco Dec. 31, 2003, pet. ref'd) (mem.
op., not designated for publication); Singleton v. State, Nos. 05-92-01702-CR, 05-92-01703-CR, 05-92-01704-CR, 1993 WL 493734, at *3 (Tex. App.-Dallas Nov. 30, 1993, pet.
ref'd) (not designated for publication). In addition, the court of criminal appeals has
specifically stated that, for an issue pertaining to the admission of evidence to be
preserved, a proper objection must be made "'each time the inadmissible evidence is
offered or obtain a running objection.'" Lane, 151 S.W.3d at 193 (quoting Valle v. State,
109 S.W.3d 500, 509 (Tex. Crim. App. 2003)). 

 Here, Samora did not object each time Hernandez testified to Samora's purported
extraneous bad acts, nor did he obtain a running objection from the trial court. See Lane,
151 S.W.3d at 193; Valle, 109 S.W.3d at 509. Instead, Samora simply lodged a pre-emptive objection to all of Hernandez's testimony even though it was not clear as to what
Hernandez was going to testify to at the time the objection was made. See Dinkins, 894
S.W.2d at 335; Wilson, 44 S.W.3d at 606; see also Moore, 2006 Tex. App. LEXIS 9945,
at **6-7. 

 Moreover, even if Samora had properly preserved his complaint about Hernandez's
testimony, we conclude that the trial court did not abuse its discretion in admitting
Hernandez's testimony regarding Samora's purported extraneous bad acts because it falls
within the purview of article 38.37, section 2. See Tex. Code Crim. Proc. Ann. art. 38.37,
§ 2. Hernandez testified to various instances of abuse perpetrated by Hernandez against
B.W., including: (1) hitting B.W. and calling her a "little nigger baby"; (2) putting lit
cigarettes in B.W.'s mouth; (3) throwing a urine-soaked shirt at B.W.; and (4) throwing a
comforter on B.W. to make B.W. fall down. Hernandez's testimony describes the history
of the relationship between Samora and B.W. and establishes Samora's consistently
hostile behavior or, in other words, his state of mind as it relates to B.W. See id. 

 Rule 403 provides that "evidence may be excluded if its probative value is
substantially outweighed by the danger of unfair prejudice, confusion of the issues, or
misleading the jury, or by considerations of undue delay, or needless presentation of
cumulative evidence." Tex. R. Evid. 403. Texas courts have held that even when evidence
of a defendant's extraneous acts is relevant under article 38.37, the trial court is still
required to conduct a rule 403 balancing test upon proper objection or request. See Hitt
v. State, 53 S.W.3d 697, 706 (Tex. App.-Austin 2001, pet. ref'd) (citing Walker v. State,
4 S.W.3d 98, 103 (Tex. App.-Waco 1999, pet. ref'd); Poole v. State, 974 S.W.2d 892, 897
(Tex. App.-Austin 1998, pet. ref'd); Ernst v. State, 971 S.W.2d 698, 700-01 (Tex.
App.-Austin 1998, no pet.); Stahle v. State, 970 S.W.2d 682, 689 (Tex. App.-Dallas 1998,
pet. ref'd); Hinds v. State, 970 S.W.2d 33, 35 (Tex. App.-Dallas 1998, no pet.)). Rule 403
does not require that the balancing test be performed on the record. See Yates v. State,
941 S.W.2d 357, 367 (Tex. App.-Waco 1997, pet. ref'd). It is assumed that the trial court
applied a rule 403 balancing test and determined that the evidence is admissible when it
overrules a rule 403 objection. See id.; see also Poole, 974 S.W.2d at 897. Based on our
review of the evidence, we conclude that Hernandez's testimony is relevant (11) and probative
of the relationship between Samora and B.W. and any prejudice created by the admission
of such evidence is outweighed by the probative nature of the evidence. See Tex. R. Evid.
403. Thus, we cannot say that the trial court abused its discretion in overruling Samora's
rule 403 objection. See id.; see also Powell, 63 S.W.3d at 438.

 Based on the foregoing, we conclude that the trial court did not abuse its discretion
in allowing Hernandez to testify as to Samora's relationship with B.W. and various
instances where Samora engaged in inappropriate conduct with B.W. (12) See Powell, 63
S.W.3d at 438. 

C. Webb's Testimony

 Regarding his complaint about Webb's testimony, Samora directs us to the following
exchange:

 [The State]: Was there ever a time that [B.W.] went to your mom's house
or back to [the biological father's] house and she had bite
marks on her? 

 [Webb]: Yes ma'am. 

 [Defense counsel]: Your Honor, I'm going to object, relevance.

 THE COURT: Come forward. 

 (Bench conference)

 THE COURT: The objection is relevance.

 [The State]: Your Honor, it goes to intent again. This was a
gradual process where he started abusing this
child physically and emotionally.

 THE COURT: Is that what you're trying to establish?

 [The State]: Yes.

 [Defense counsel]: Your Honor, also my objection would be that
there was really no clear identity as to who did
these bite marks. The story changed. 
Additionally, I have not been given proper notice
under my request to the State regarding
extraneous offenses that they were going to be
bringing these up in the case[-]in[-]chief.


 [The State]: Your Honor, it's not an extraneous offense. It's
part of the continuing course of conduct of this
Defendant. And not only that, it's been clear in
the discovery that initially she said it was her and
then she said it was her and Tank. It's in the
discovery. It's in the statements that she gave.


 THE COURT: The objection is overruled.

 Once again, Samora makes procedural and substantive objections to testimony
regarding Samora's prior bad acts against B.W. With respect to the procedural aspect of
his objection, Samora does not reference article 38.37 or any other notice provisions in his
objection, nor does the record reflect that Samora obtained a ruling from the trial court
specifically pertaining to article 38.37. See Tex. R. App. P. 33.1(a); Espinosa, 853 S.W.2d
at 38-39; see also Mitchell, 982 S.W.2d at 427. We conclude that Samora's failure to
object under article 38.37 and obtain a ruling waives the notice requirement and, thus,
does not preserve for appellate review his notice arguments pertaining to Webb's
testimony. See Espinosa, 853 S.W.2d at 38-39; see also Mitchell, 982 S.W.2d at 427. 

 Samora's substantive arguments about Webb's testimony center on rules 403 and
404. In particular, Samora argues that the testimony was irrelevant and, thus, nor
probative because Webb did not initially identify Samora as the individual who caused the
bite marks. However, Samora's argument is belied by later testimony offered by Webb
identifying Samora as the individual who left bite marks on B.W. when they were playing. 
See Lane, 151 S.W.3d at 193; see also Valle, 109 S.W.3d at 509; Leday, 983 S.W.2d at
718. Like Hernandez's testimony, Webb's testimony regarding bite marks on B.W. falls
within the purview of article 38.37, as it illustrates the relationship between Samora and
B.W. See Tex. Code Crim. Proc. Ann. art. 38.37, § 2. Because this testimony is relevant
and probative of the relationship between Samora and B.W, we further conclude that the
trial court did not abuse its discretion in determining that the probative value of this
testimony outweighed any prejudicial effect. See Tex. R. Evid. 402, 403; see also Powell,
63 S.W.3d at 438. Based on the foregoing, we overrule Samora's second issue.

IV. Legal and Factual Sufficiency

 By his first issue, Samora contends that the evidence supporting his conviction is
legally and factually insufficient. We disagree.

A. Standard of Review and Applicable Law

 In reviewing the legal sufficiency of the evidence, an appellate court must review all
the evidence in the light most favorable to the verdict, and ask whether "'any rational trier
of fact could have found the essential elements of the crime beyond a reasonable
doubt--not whether it believes that the evidence at the trial established guilt beyond a
reasonable doubt.'" Laster v. State, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009) (quoting
Jackson v. Virginia, 443 U.S. 307, 318-19 (1979)) (emphasis in original). The trier of fact
is the sole judge of the facts, the credibility of the witnesses, and the weight given to
testimony. See Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Jackson, 443 U.S.
at 318-19; Beckham v. State, 29 S.W.3d 148, 151 (Tex. App.-Houston [14th Dist.] 2000,
pet. ref'd). We do not reevaluate the weight and credibility of the evidence, and we do not
substitute our own judgment for that of the trier of fact. King v. State, 29 S.W.3d 556, 562
(Tex. Crim. App. 2000) (en banc); Beckham, 29 S.W.3d at 151. We resolve any
inconsistencies in the evidence in favor of the judgment. Curry v. State, 30 S.W.3d 394,
406 (Tex. Crim. App. 2000).

 In conducting a factual sufficiency review, a court of appeals reviews the evidence
in a neutral light to determine whether the evidence is so weak that the jury's verdict seems
clearly wrong and manifestly unjust or against the great weight and preponderance of the
evidence. Neal v. State, 256 S.W.3d 264, 275 (Tex. Crim. App. 2008); Watson v. State,
204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). Unless the record clearly reveals that a
different result is appropriate, we must defer to the fact-finder's determination concerning
the weight to be given to contradictory testimony. Lancon v. State, 253 S.W.3d 699, 705
(Tex. Crim. App. 2008).

 The State is not required to present direct evidence, such as eyewitness testimony,
to establish guilt. See Guevara v. State, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). 
"Circumstantial evidence is as probative as direct evidence in establishing guilt of the actor,
and circumstantial evidence alone can be sufficient to establish guilt." Hooper v. State,
214 S.W.3d 9, 13 (Tex. Crim. App. 2007); see Guevara, 152 S.W.3d at 49. The law does
not require that each fact "point directly and independently to the guilt of the appellant, as
long as the cumulative effect of all the incriminating facts is sufficient to support the
conviction." Hooper, 214 S.W.3d at 13; see Guevara, 152 S.W.3d at 49.

 Both legal and factual sufficiency are measured by the elements of the offense as
defined by a hypothetically correct jury charge. Grotti v. State, 273 S.W.3d 273, 280-81
(Tex. Crim. App. 2008); Malik v. State, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997); see
Adi v. State, 94 S.W.3d 124, 131 (Tex. App.-Corpus Christi 2002, pet. ref'd). "'Such a
charge [is] one that accurately sets out the law, is authorized by the indictment, does not
unnecessarily increase the State's burden of proof, or unnecessarily restrict the State's
theories of liability, and adequately describes the particular offense for which the defendant
was tried.'" Villarreal v. State, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (quoting Malik,
953 S.W.2d at 240). 

 Under the Texas Penal Code, "[a] person commits an offense [of injury to a child]
if he intentionally, knowingly, recklessly, or with criminal negligence, by act or intentionally,
knowingly, or recklessly by omission, causes to a child . . . a serious bodily injury . . . ." 
Tex. Penal Code Ann. § 22.04(a)(1); see Jefferson v. State, 189 S.W.3d 305, 312 (Tex.
Crim. App. 2006). Section 22.04 defines a "child" as a person fourteen years of age or
younger. Tex. Penal Code Ann. § 22.04(c)(1). "'Serious bodily injury' means bodily injury
that creates a substantial risk of death or that causes death . . . ." Id. § 1.07(a)(46) (Vernon 
Supp. 2009).

 "'[A]ct or omission' constitute the means of committing the course of conduct
element of injury to a child." Jefferson, 189 S.W.3d at 312. "[T]he essential element or
focus of the statute is the result of the defendant's conduct (in this case, serious bodily
injury to a child) and not the possible combinations of conduct that cause the result." Id.;
see Alvarado v. State, 704 S.W.2d 36, 39 (Tex. Crim. App. 1985) (stating that, because
the injury-to-a-child statute does not specify the "nature of conduct," the nature of the
conduct is inconsequential as long as "the conduct (whatever it may be) is done with the
required culpability to effect the result the Legislature has specified") (emphasis in original). 

 The record reflects that Samora was charged with first-degree injury to a child,
which, as provided by section 22.04(e), requires the fact-finder to conclude that the
defendant committed the offense intentionally or knowingly. See Tex. Penal Code Ann.
§ 22.04(e). A person acts intentionally "with respect to . . . a result of his conduct when it
is his conscious objective or desire to . . . cause the result of his conduct." Id. § 6.03(a)
(Vernon 2003). A person acts knowingly "with respect to the result of his conduct when he
is aware that his conduct is reasonably certain to cause the result." Id. § 6.03(b). Intent
may "be inferred from circumstantial evidence[,] such as acts, words, and the conduct of
the appellant." Guevara, 152 S.W.3d at 50; see also Hart v. State, 89 S.W.3d 61, 64 (Tex.
Crim. App. 2002) (stating that a fact-finder may infer both knowledge and intent from the
defendant's acts, words, or conduct and from the nature of the wounds inflicted on the
victim); Ledesma v. State, 677 S.W.2d 529, 531 (Tex. Crim. App. 1984) (noting that the
requisite culpable mental state may also be inferred from the surrounding circumstances).

B. Discussion

 Here, the evidence demonstrated that, shortly after being in Samora's sole custody,
B.W. began to exhibit symptoms--vomiting, losing consciousness, hemorrhaging of the
eye and brain cavities--associated with the injuries she sustained. Drs. Harper and Burke
both testified that B.W. would have became symptomatic immediately after sustaining the
injuries in question. Webb testified that she noticed that B.W. was not well approximately
two minutes after arriving home from her trip to Whataburger. Furthermore, it is noteworthy
that the door to the house and the door to Samora's bedroom were both locked when
Webb returned home even though Webb had not locked either door when she left, which
seems to suggest that Samora was trying to hide something. 

 The record indicates that B.W. did not have most of the twenty-nine visible bruises,
abrasions, and marks on her body, prior to being in Samora's custody. Corina, Samora's
mother, testified that B.W. was in good health when she brought B.W. back to the house
except for the fact that B.W. was fussy, had a cold, and had reddish bruises on her ears. 
Detective Flores noted that the security cameras from the Stripes convenience store
demonstrated that B.W. was able to walk and talk when she was in Corina's custody. 
Several witnesses testified to Samora's relationship with B.W. and described a pattern of
abusive behavior engaged in by Samora and directed towards B.W. Webb, Corina, and
Hernandez all testified that Samora was not close with B.W. and often called her a "nigger
baby." The record contains testimony that Samora often hit B.W. on her head, bit her on
her arms, threw her up in the air even though B.W. was scared of Samora, and threw a
urine-soaked shirt on B.W. after B.W.'s diaper had leaked onto his shirt. Furthermore,
Webb and Hernandez recalled seeing Samora: (1) throw a comforter on B.W. to force her
to fall down; and (2) place cigarettes in B.W.'s mouth. Hernandez testified that, on one
occasion, Samora placed a lit cigarette in B.W.'s mouth; however, Webb refuted
Hernandez's testimony by stating that the cigarette could not have been lit while it was in
B.W.'s mouth because the lighter located in the house was broken. Webb noted that B.W.
was approximately two years old at the time of the incident. Drs. Harper and Burke both
testified that B.W.'s injuries were life-threatening and noted that, as a result of the injuries
sustained, a resection of half of B.W.'s brain was necessary for her survival. 

 On appeal, Samora argues that the evidence is legally and factually insufficient
based on the following contrary evidence: (1) testimony from several of Samora's friends
that Samora was good with their children and that Samora had many African-American
friends; (2) testimony that Samora was not a racist and that the use of the phrase "nigga
baby" was a term of endearment; (3) testimony that Samora would color with B.W.; (4)
testimony that B.W. was not feeling well when she was in Corina's custody; and (5)
testimony that B.W. had red marks and bruising on her ears, a lack of an appetite, and was
fussy prior to being in Samora's custody. In addition, Samora directs us to Webb's
testimony that she did not know who hurt B.W. and that she did not believe that Samora
had injured B.W., suggesting that the lack of direct evidence in this case renders the
evidence supporting the jury's verdict legally and factually insufficient. Samora also argues
that one doctor's opinion that the injuries sustained by B.W. occurred approximately eight
to twelve hours prior to Webb checking B.W. in at the hospital at around 6:23 a.m. on
January 3, 2009, proves that the injuries sustained could not have been caused by him
given that B.W. was in Corina's custody at that time. 

 Regarding the purported contrary evidence about Samora's interactions with his
friends' children and his associations with other African-Americans, we, once again, note
that is within the province of the jury to reconcile inconsistencies in the evidence. See Tex.
Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Jackson, 443 U.S. at 318-19; Curry, 30
S.W.3d at 406; King, 29 S.W.3d at 562; Beckham, 29 S.W.3d at 151. With respect to
Samora's inference regarding the lack of direct evidence in this case, the court of criminal
appeals has held that a conviction may be sustained solely on circumstantial evidence;
thus, it is not necessary for the State to present direct evidence establishing Samora's guilt. 
See Hooper, 214 S.W.3d at 13; see also Guevara, 152 S.W.3d at 49. Finally, we do not
find Samora's argument pertaining to the timing of B.W.'s injuries to be persuasive
because both Drs. Harper and Burke disagreed with the findings of the first doctor, whose
opinion was based on the initial CAT scan, and the resolution of this inconsistency in the
evidence was within the province of the jury to resolve. See Lancon, 253 S.W.3d at 705. 
Clearly, the jury believed the testimony of Drs. Harper and Burke regarding the timing of
B.W.'s injuries, and we must defer to the jury's resolution of the facts. See Clayton v.
State, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) ("When the record supports conflicting
inferences, we must presume that the fact[-]finder resolved the conflicts in favor of the
prosecution and therefore defer to that determination.") (citing Jackson, 443 U.S. at 326). 

 Reviewing the evidence in the light most favorable to the verdict, we hold that a
reasonable fact-finder could have concluded that Samora intentionally or knowingly caused
serious bodily injury to B.W., a child under the age of fourteen beyond a reasonable doubt. 
See Tex. Penal Code Ann. § 22.04(a)(1); Jefferson, 189 S.W.3d at 312; see also Jackson,
443 U.S. at 318-19; Laster, 275 S.W.3d at 517. As such, we conclude that the evidence
is legally sufficient to sustain Samora's conviction. See Jackson, 443 U.S. at 318-19;
Laster, 275 S.W.3d at 517. Reviewing the evidence in a neutral light, we cannot say that
the evidence is so weak that the jury's verdict is clearly wrong and manifestly unjust or
against the great weight and preponderance of the evidence. See Neal, 256 S.W.3d at
275; see also Watson, 204 S.W.3d at 414-15. Accordingly, we conclude that the evidence
is factually sufficient. See Neal, 256 S.W.3d at 275; see also Watson, 204 S.W.3d at 414-15. We overrule Samora's first issue. 

V. Conclusion

 Because we have overruled all of Samora's issues on appeal, we affirm the
judgment of the trial court. 

 ________________________

 ROGELIO VALDEZ

 Chief Justice 

Do not publish. 

Tex. R. App. P. 47.2(b)

Delivered and filed the 

19th day of August, 2010. 
1. Because this case involves allegations of physical abuse against a minor child, we will identify the
child by her initials throughout the opinion. See Tex. R. App. P. 9.8.
2. The blanket referenced by Samora was later identified as a comforter, and Detective Flores testified
that some bodily fluid was found on the comforter. Detective Flores photographed the comforter but was
unsure whether the fluid was vomit or blood. No tests were conducted on the comforter.
3. In speaking with Webb, Dr. Harper observed that Webb was not tearful or upset like she would have
expected a mother to be upon learning that her child had sustained life-threatening injuries. 
4. The record reflects that B.W.'s father is African-American.
5. Webb testified that Samora would roll B.W. up in the comforter and then push her down the hall to
let the comforter unroll while B.W. was still in it. It was established that the carpet in the residence was thin
and that a step was near the place where Samora would "unroll" B.W. in the comforter.
6. Natalie Gaytan, Samora's sister, testified that she lived with Samora at the time of the incident, and
that she did not notice any bruising on B.W. when changing B.W.'s diaper during the day of January 2, 2009;
however, when re-called to testify later in the trial, Gaytan stated that she observed bruising on B.W.'s ears
on January 1, 2009.
7. On cross-examination, Webb testified that, shortly before the incident, B.W. had been treated for
an unspecified eye condition, and that she had encounters on prior occasions with Child Protective Services
regarding B.W.
8. When Webb was asked about a notation made by a nurse at Driscoll who allegedly overheard Webb
"saying something about keeping the story straight" to someone on the phone, Webb denied ever saying that
and denied ever changing her story or lying to investigators to protect her boyfriend, Samora. 
9. The record reflects that Webb was charged with an unknown offense pertaining to this incident.
10. Texas Rule of Appellate Procedure 33.1(a) also provides that a complaint may be preserved for
appellate review if: (1) an objection stating grounds with specificity is made in a timely manner; (2) the
applicable rules of evidence and civil and appellate procedure are complied with; and (3) the trial court refused
to rule on the objection and the complaining party objected to the refusal to rule. Tex. R. App. P. 33.1(a). To
the extent that Samora could argue that the trial court refused to rule on his objection, we note that the record
does not indicate that Samora objected to the trial court's purported refusal to rule on the objection. See id.
at R. 33.1(a)(2)(B). Therefore, such an argument lacks merit. See id. at R. 33.1(a).
11. Texas Rule of Evidence 401 defines "[r]elevant evidence" as "evidence having any tendency to
make the existence of any fact that is of consequence to the determination of the action more probable or less
probable than it would be without the evidence." Tex. R. Evid. 401. Furthermore, rule 402 provides that all
relevant evidence is generally admissible. Id. at R. 402.
12. We also note that Samora did not specifically object to portions of Webb and Corina's testimony
that corroborated Hernandez's testimony regarding the various incidents between Samora and B.W. See
Lane v. State, 151 S.W.3d 188,193 (Tex. Crim. App. 2004) (holding that any error in the admission of
evidence is generally cured if the same or substantially similar evidence is admitted elsewhere in the trial);
see also Valle v. State, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003) ("Our rule . . . is that overruling an
objection to evidence will not result in reversal when other such evidence was received without objection,
either before or after the complained-of ruling."); Leday v. State, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998)
(holding that this rule applies whether evidence that is the same or substantially similar to the complained-of
evidence is introduced by the defendant or the State). Therefore, any potential error in permitting Hernandez
to testify as to Samora's inappropriate conduct towards B.W. would be harmless.