**MODIFY and AFFIRM; and Opinion Filed April 15, 2019.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-18-00491-CR

### RODNEY COLLINS SMITH, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the 292nd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F-18-00143-V**

# MEMORANDUM OPINION
Before Justices Whitehill, Molberg, and Reichek
Opinion by Justice Molberg

A jury found Rodney Collins Smith guilty of murder, and the trial court assessed punishment at life imprisonment. In five issues, Smith contends: (1) the evidence is legally insufficient to support the conviction; (2) and (3) the trial court committed reversible error in overruling his objections to hearsay evidence; (4) the trial court erred in denying his motion for directed verdict; and (5) the jury charge improperly permitted the jury to convict Smith on a theory not supported by the evidence. In a single cross-point, the State requests that we modify the judgment to correctly reflect the trial court, rather than the jury, assessed punishment. We modify the judgment, and affirm the trial court's judgment as modified.

# BACKGROUND

On January 1, 2017, Linda Lee Harris was discovered dead in the master bedroom of her apartment by family and Garland Police Department officers.[1]  Her body was found between a dresser and the bed.  Blood was splattered everywhere.  Harris sustained numerous blunt-force injuries and eighty-nine sharp-force injuries to her head, trunk, and extremities.  Harris lived in the apartment with Smith; her son, Ramon; and Ramon's girlfriend, Elizabeth Martinez.  Only Harris and Smith had keys to the apartment.

At trial, Harris' daughter, Ashley Jones, testified Harris and Smith attended a family party the previous night at the home of Jones' stepmother.  Some of the approximately fifteen attendees were drinking, but no one appeared intoxicated.  Harris went to the party early in the evening.  Smith arrived before midnight with Terry Branch, Harris' nephew, who gave Smith a ride.  While they were en route to the party, Smith complained to Branch he believed Harris was cheating on him.  They stopped at a liquor store, and Smith purchased a "big, tall," quart-sized bottle of "Jack Daniel's," which he drank at the party.  According to Branch, Smith appeared intoxicated.  Several people saw and/or heard Smith and Harris arguing at the party.

Branch testified he drove Smith and Harris from the party to their apartment at around 2:45 a.m. on January 1.  In the car on the way home, Smith and Harris argued about Harris' ex-boyfriend, Adam, and about "the Jack Daniel's bottle."  Harris took the bottle, and Smith was "upset" that Harris would not give it back to him.  Smith and Harris continued to argue outside of the car when they arrived at the apartment.  When he saw that Smith "was about to hit [Harris]," Branch jumped out of the car "to calm things down," and told Smith to "go upstairs, and [Smith] got mad and pushed [Branch]."  Branch testified, "[then Smith] went on upstairs [and Harris]

---

[1] Harris' family called the police on the evening of January 1, after repeatedly trying to reach her by phone and knocking on her apartment door throughout the day.  Ashley Jones, Harris' daughter, testified it was unusual for Harris to not answer her phone or see members of her family every day.

looked at me and said, 'I'm scared.'" Branch told Harris to call him if she needed him, and watched Smith and Harris go into the apartment.

At work the next day, Branch received a call from Ramon and Harris' mother ("Grandma"). According to Branch,

> Grandma was crying something about [Harris] didn't show up today. And [Harris is] like clockwork, she comes over every day like clockwork unless she's got a headache.

Branch was unable to reach Harris by phone, and when he called Smith, he discovered that Smith left his phone in Branch's car the night before. After numerous unsuccessful attempts by various family members to locate Harris, Branch called 9-1-1. A recording of the 9-1-1 call was admitted into evidence and played for the jury.

Police Officer Jordan Murphy testified he received a call for a welfare check around 9:45 p.m. on January 1, 2017. He arrived at Harris' apartment and was joined by Officer Garrison[2] shortly thereafter. According to Officer Murphy, there were around ten people at the scene, all of whom were "very concerned," and wanted to know if they or Officer Murphy could make a forced entry into Harris' apartment to check on her. Officer Murphy allowed Ramon, as a resident, to forcibly enter the apartment. When Ramon kicked open the door, "they all went into the apartment. They went to a room . . . . Everyone immediately ran back out and started screaming." Officer Murphy described Harris' family as "hysterical" and "frantic." Officers Murphy and Garrison had "eyes on the people who ran into the apartment the entire time they were in there," and "as soon as they got to the room . . . they turned back around immediately [and] just started screaming and panicked." The officers did a protective sweep of the apartment and did not locate anyone other than Harris, the "deceased." They secured the scene and waited for paramedics to arrive. Officer Murphy stayed at the scene until Harris' body was removed from the apartment.

---

[2] Officer Murphy did not provide Officer Garrison's first name.

Nick Vann, a homicide detective with the Garland Police Department, investigated the murder, and went to the crime scene on January 1. Detective Vann testified that Branch told him that "he had heard from somebody that [Harris] had got hit in the head with the Jack Daniel's bottle." After locating a crime scene photo of the bottle, detectives returned to Harris' apartment to retrieve it.[3] The bottle was found on the dresser in Harris' bedroom. Detective Vann testified that, to his knowledge, blood was not found on the bottle; it did not appear to him that the bottle had been used in an assault; and the bottle had no evidentiary value.

Dulce Hernandez, a forensic investigator with the Garland Police Department, testified she used a substance called BLUESTAR to detect blood at the crime scene. Blood was detected on almost every surface in the bathroom. Blood also was detected in the bedroom, hallway, and entryway, and on many items in the apartment. According to Investigator Hernandez, there was no blood in Ramon's bedroom.

After talking with witnesses, police identified Smith, the last person seen with Harris, as the sole suspect. Over the course of the next sixteen days, Detective Vann methodically sought and tracked down leads to locate Smith. He searched bus and train stations, and "start[ed] contacting anyone who might know him." He visited several houses, attempting to locate Smith's family members. After learning that a debit card belonging to Harris was missing and had been used to withdraw money from a convenience store ATM after her death, he viewed surveillance video from the convenience store and obtained Harris' bank records. A source informed Detective Vann that Smith had been to his mother's house. Detective Vann located and spoke with Smith's aunt, who Smith visited sometime after the murder. Smith's aunt mentioned a man named "Bo" who worked at Parkland Hospital. Detective Vann located Bo, who provided the number of the cellphone Smith was using. From a different source, Detective Vann learned that Smith was

---

[3] The Jack Daniel's bottle was collected as evidence "a few days after the offense."

staying at a hotel. After searching a number of hotels in the area, he found a hotel that had a surveillance video recording of Smith.

In addition to providing his card, Detective Vann took the unusual step of giving his cellphone number to Harris' family, telling them, "[I]f you see him, just tell him to call me." Smith eventually called Detective Vann, and agreed to meet the next day. When Smith did not turn himself in, Detective Vann got a subpoena on his own cellphone to obtain the number Smith used to make the call, and involved the U.S. Marshals, who used their "ping truck" to try to identify the location of Smith's cellphone. Ultimately, a Crime Stoppers tip led Detective Vann to an apartment complex where Smith was apprehended on January 17, 2017.

Smith voluntarily participated in a recorded interview with Detective Vann, which was admitted into evidence and played for the jury. Smith admitted "wrestling" with Harris the night she was killed. Smith told Detective Vann that Harris committed suicide in front of him by cutting her throat with a box cutter he brought home from work. Harris' autopsy, however, revealed her throat had not been cut. Detective Vann observed that Smith's arm and the palm of his hand were injured. Smith claimed he sustained the injuries when Harris fell on him while she was holding the box cutter. Smith said he did not remember anything after Harris cut her throat. Detective Vann testified that Smith claimed he passed out, and "didn't wake up until about six or seven o'clock the next evening." Smith told Detective Vann that after he cleaned up the scene, he left, taking Harris' debit card, which he used to withdraw money from her bank account at a convenience store ATM.

Robert Gomez was a resident at the apartment complex. Gomez testified he saw Smith exit Harris' apartment around 5 p.m. on January 1, lock the door, and walk downstairs. According to Gomez, Smith was carrying two bags.

Officers did not find a box cutter during their initial investigation. On January 21, 2017, Jones and other family members found a black box cutter between the headboard and the wall in the master bedroom where Harris died. The box cutter blade appeared to have blood on it. Harris' family put the box cutter in a police evidence envelope containing a cigarette the police accidentally had left on the dining room table.[4] The police picked up the envelope from Grandma's house fifteen minutes later. Detective Vann testified he did not conduct DNA testing on any evidence because Harris and Smith lived in the same apartment and Smith's DNA and fingerprints would be in the apartment and on articles in the apartment; and, Smith had admitted "he was the only one there with [Harris]." The BB gun and knife Detective Vann found on Ramon's bed were not fingerprint-tested for the same reason.

Detective Lucas Shupe conducted a data extraction on Harris' cellphone. The data indicated Harris used her cellphone to access her Facebook account between midnight and 3 a.m. on January 1. The cellphone contained a number for Adam Robertson[5] and Adam Deculit, who had been arrested for aggravated assault with a deadly weapon on September 25, 2017, but Detective Vann did not run their names for a criminal background check.

Dr. Petra Rahaman, an autopsy pathologist, performed the autopsy on Harris, and his autopsy report was admitted into evidence. Dr. Rahaman testified Harris suffered blunt- and sharp-force injuries to her head, face, trunk, and extremities. Numerous photographs of Harris' body and injuries, including photographs taken by Dr. Rahaman, were admitted into evidence. A "set of blunt force injuries to the back of [Harris'] head" went "through the skin and soft tissue to the

---

[4] Detective Vann testified the box cutter should not have been placed in the same evidence envelope as the cigarette because it could contaminate the DNA. The box cutter and cigarette were not DNA-tested.

[5] Substantive trial testimony regarding Adam Robertson was limited to acknowledgment that his name was in Harris' cell phone; detectives did not conduct a background check or DNA test on Robertson; Detective Vann would not be surprised to learn Robertson was convicted of assault family violence because "[he] work[ed] those kind of cases [and] some folks have a past that show[s] a violent history against women"; and, Robertson "[made] contact" with Harris through a "group text." Detective Vann testified that neither Deculit nor Robertson "put themselves in [Harris'] apartment the night that she died."

skull," causing a "defect" in the skull, meaning "a chip of the bone was missing from the skull." According to Dr. Rahaman, four lacerations on Harris' head were caused by four blows with a blunt object, or two blows that each created two lacerations. Dr. Rahaman could not conclusively identify the object used to inflict Harris' head injuries. Because Harris' skull was "thicker than the normal person" and "she [had] thick hair," Dr. Rahaman believed it would "have taken more force to inflict these particular injuries on Ms. Harris than it would on the average person." The only injury in proximity to Harris' neck and throat was a "superficial half-inch incised wound . . . just under [the] jaw." Harris sustained blunt- and sharp-force injuries to her forehead, cheek, ear, chin, eyebrow, and the side of her face.

Blunt- and sharp-force injuries on Harris' trunk included abrasions and contusions above her breasts, the side of her body, the right and left sides of her back, her arms, her wrists, and her legs. Harris' autopsy revealed a total of 89 sharp-force injuries. Dr. Rahaman testified Harris' palms and the back of her hands "had a total of 59 incised wounds" of various length and depth, some of which transected tendons. According to Dr. Rahaman, the "pattern, location, and number of wounds in this case were indicative [of] *defensive wounds*. They're textbook, classic defensive wounds" (emphasis in trial transcript). Hair was found in the defensive wounds on Harris' hands. Dr. Rahaman testified the sharp-force injuries to the back of Harris' hands and to her head could indicate she was "defending the back of her head by covering it with her hands while also being stabbed." This scenario would be a "reasonable explanation for [the] hair [found] inside the incisions on her hand."[6] A "very sharp[,] sharp instrument" was used to inflict Harris' sharp-force wounds, "potentially . . . consistent with a box cutter" or a knife.

---

[6] On cross-examination, Dr. Rahaman testified the hair found in the defensive wounds on Harris' hands also could have resulted from Harris "grabbing and pulling the hair from someone else" while "defending herself or fighting off someone."

Dr. Rahaman submitted Harris' brain to a neuropathologist. The examination revealed that "immediate[ly] before death," Harris had "necrosis or death of some of her brain cells . . . [and] her brain was also mildly swollen or had mild generalized edema." Dr. Rahaman testified this indicated a "global lack of oxygen to her brain," and was "potentially indicative of asphyxiation." While Dr. Rahaman could not conclusively say asphyxiation was the "mechanism" of Harris' death, there were pathological findings she had "a lack of oxygen, or asphyxia." Dr. Rahaman concluded Harris' cause of death was homicidal violence due to blunt- and sharp-force injuries, and asphyxia "may have played a role" in her death, as indicated by the dead neurons in her brain cells.

**The Indictment**

Smith was indicted for murder. In the indictment, the State alleged Smith did then and there: (1) intentionally and knowingly cause Harris' death by causing blunt-force injuries to Harris with an unknown object, a deadly weapon, the exact nature and description of which is unknown and unknowable to the grand jury, (2) intentionally and knowingly cause Harris' death by causing sharp-force injuries to Harris with an unknown object, a deadly weapon, the exact nature and description of which is unknown and unknowable to the grand jury, and (3) by intentionally and knowingly asphyxiating Harris by means unknown to the grand jury with an unknown object, a deadly weapon, the exact nature and description of which is unknown and unknowable to the grand jury. The indictment also alleged that Smith did then and there intend to cause serious bodily injury to Harris, committed an act clearly dangerous to human life, and caused Harris' death by the same three alternative manner-and-means theories.

**The Jury Charge**

The jury charge allowed the jury to find Smith guilty of murder under any of the three alternative manner and means alleged in the indictment. The charge included an instruction that

the verdict must be unanimous. The verdict form asked for a general verdict of guilty or not guilty of murder. The jury found Smith guilty of murder.

## SUFFICIENCY OF THE EVIDENCE

In his first issue, Smith argues the evidence is legally insufficient to support his murder conviction because the evidence merely raised a suspicion of guilt. According to Smith, no rational jury could find him guilty with the "mere modicum" of evidence presented by the State. Smith specifically contends: (1) the detectives failed to conduct a proper investigation; (2) the investigation was "so sloppy that a cigarette butt that had been bagged for evidence was left in the house for three weeks after the murder"; (3) "no DNA analysis was performed on anything," including blood splatter found at the scene; and (4) the police failed to investigate other suspects "who had [v]iolent backgrounds and were involved with the deceased."

### Standard of Review

In reviewing a challenge to the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the prosecution in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We consider all of the evidence, whether or not properly admitted. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999).

The factfinder is the sole judge of the weight and credibility of the evidence and witness testimony. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04; *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim. App. 2008). As such, it is the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319. We may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Dewberry*, 4 S.W.3d at 740. Instead, we determine whether the necessary inferences are reasonable based upon the combined and

cumulative force of all the evidence when viewed in the light most favorable to the verdict. *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). We presume the factfinder resolved any conflicting inferences in favor of the prosecution and defer to that resolution. *Jackson*, 443 U.S. at 326. The standard of review is the same for direct and circumstantial evidence cases. *Hooper*, 214 S.W.3d at 13. Circumstantial evidence is as probative as direct evidence in establishing the defendant's guilt. *Id*.

### Applicable Law

A person commits murder if he intentionally or knowingly causes the death of another person, or intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of another person. TEX. PENAL CODE ANN. §§ 19.02(b)(1), (2). To obtain a conviction for murder, the State had to prove beyond a reasonable doubt that (1) Smith intentionally or knowingly caused Harris' death by (a) causing blunt-force injuries to Harris by manner and means unknown to the grand jury; (b) causing sharp-force injuries to Harris by manner and means unknown to the grand jury; or, (c) by asphyxiating Harris by manner and means unknown to the grand jury; or, (2) Smith, with intent to cause serious bodily injury to Harris, committed an act clearly dangerous to human life, and caused Harris' death by (a) causing blunt-force injuries to Harris by manner and means unknown to the grand jury; (b) causing sharp-force injuries to Harris by manner and means unknown to the grand jury; or, (c) by asphyxiating Harris by manner and means unknown to the grand jury.

### Analysis

The evidence at trial established that Smith was angry and upset throughout the evening of December 31, 2016, into the early morning hours of January 1, 2017, because he believed Harris was cheating on him. The jury heard Branch's testimony that on the way to the party, Smith complained he believed Harris was cheating on him. Several witnesses testified that Smith argued

with Harris at the party. Branch testified that Smith and Harris argued about Harris' ex-boyfriend, Adam, on the drive home from the party and continued to argue in the parking lot after they arrived at the apartment. The jury heard testimony that Branch jumped out of the car to prevent Smith from hitting Harris, and Smith pushed Branch when he intervened.

The jury heard Detective Vann's testimony that it appeared a fight occurred in the apartment bathroom, hallway, and master bedroom. Smith admitted he wrestled with Harris before her death. Smith claimed Harris used a box cutter to cut her own throat, although the autopsy showed that was not true. Smith admitted the box cutter was his.

While motive is not an element of murder, evidence of motive is relevant as a circumstance tending to prove guilt. *See Russo v. State*, 228 S.W.3d 779, 794 (Tex. App.—Austin 2007, pet. ref'd); *see also Clayton v. State*, 235 S.W.3d 772, 778–81 (Tex. Crim. App. 2007). The jury could reasonably infer that Smith killed Harris because he was upset and angry about his belief that Harris was cheating on him.

The jury heard Dr. Rahaman's testimony that Harris suffered four head injuries resulting from blows so forceful they went through the skin and soft tissue and chipped Harris' skull. The jury saw and heard evidence showing Harris sustained 89 sharp-force injuries, including 59 incised wounds to her hands that Dr. Rahaman described as "textbook, classic" defensive wounds. Hair found in the incised wounds in Harris' hands indicated she may have been trying to protect her head during an attack. The jury also heard testimony that dead cells and swelling in Harris' brain indicated she was asphyxiated. While Dr. Rahaman did not state conclusively that Harris was asphyxiated, the pathological findings indicated "a lack of oxygen, or asphyxia."

The jury saw Smith's videotaped interview with Detective Vann. They heard Smith tell Detective Vann that Harris committed suicide by cutting her throat with the box cutter, and that the injuries on the palm of his hand and arm were caused by Harris falling on him while holding

the box cutter. The jury heard Dr. Rahaman's testimony that Harris' autopsy revealed her throat was not cut. The jury was free to reject Smith's explanation, and could reasonably have concluded the minor injuries Smith suffered on his hand and arm compared to the multitude of serious injuries Harris sustained indicated Smith repeatedly attacked Harris on her head, face, body, and extremities. When faced with conflicting evidence about the source of Harris' injuries, as well as Smith's injuries, the jury resolved the inconsistencies in favor of the State's allegation that Smith killed Harris.

When viewed in the light most favorable to the verdict, evidence that Smith fled the scene and evaded police for more than two weeks after Harris' murder also supports an inference of guilt. *Devoe v. State*, 354 S.W.3d 457, 470 (Tex. Crim. App. 2011) ("Flight is circumstantial evidence from which a jury may infer guilt."); *Clayton*, 235 S.W.3d at 780 ("We have recognized that a factfinder may draw an inference of guilt from the circumstance of flight."). The jury heard Detective Vann's testimony describing the great lengths and extraordinary measures he took over a period of sixteen days to locate Smith. Detective Vann obtained addresses and visited a number of homes to find Smith's family members. In addition to providing his card to Smith's family, he gave them his cellphone number, which was not his usual practice. When he learned Smith used Harris' debit card to withdraw money from her back account at a convenience store ATM after her death, Detective Vann obtained surveillance video from the convenience store after contacting the convenience store clerk, the owner of the convenience store, and the surveillance system company.

The evidence at trial showed that Smith knew Detective Vann was looking for him. Smith called Detective Vann and initially agreed to turn himself in but changed his mind and continued to flee. After receiving Smith's call, Detective Vann subpoenaed his own cellphone and engaged the assistance of U.S. Marshals to try and get a ping location on Smith's cellphone. In substantial detail, Detective Vann described how he followed every lead, tracking Smith as he fled from

–12–

Harris' apartment to different hideouts throughout Dallas, seeking lodging or money from: his mother's house, his aunt's house, a convenience store, "Bo" at Parkland Hospital, a hotel, and finally, the apartment complex where Smith was apprehended on January 17. Smith's flight over the course of sixteen days is circumstantial evidence from which the jury reasonably could infer guilt. *See Devoe*, 354 S.W.3d at 470.

Smith complains the police investigation was sloppy, other potential suspects were not investigated, and DNA testing was not conducted on the evidence. However, we do not review the sufficiency of the police investigation. Rather, we review the evidence presented at trial. *See McLemore v. State*, No. 05-15-00160-CR, 2015 WL 9591398, at *3 (Tex. App.—Dallas Dec. 31, 2015, no pet.) (mem. op., not designated for publication). Smith does not point to any evidence indicating that someone else killed Harris, or exonerating him. He only complains the police did not take certain investigatory steps. We do not speculate on the evidence the State did not present. *Merritt v. State*, 368 S.W.3d 516, 526 (Tex. Crim. App. 2012) (concluding appellate court "improperly used a 'divide and conquer' approach, separating each piece of evidence offered to support Appellant's conviction, followed by speculation on the evidence State did not present").

In assessing the sufficiency of the evidence to support Smith's conviction, our duty is to ensure the evidence presented supports a conclusion that Smith committed the offense of murder. *See Winfrey v. State*, 323 S.W.3d 875, 882 (Tex. Crim. App. 2010). We review the evidence to determine whether a rational jury could reasonably have concluded Smith murdered Harris; and, under this standard, we give proper deference to the jury's verdict. *See Walker v. State*, No. PD-1429-14, 2016 WL 6092523, at *14 (Tex. Crim. App. Oct. 19, 2016) (not designated for publication). The record contains substantial testamentary, physical, scientific, and circumstantial evidence permitting a jury to infer Smith killed Harris. The jury's verdict "was not a determination

so outrageous that no rational trier of fact could agree." *Wirth v. State*, 361 S.W.3d 694, 698 (Tex. Crim. App. 2012).

Accordingly, the evidence is sufficient to support Smith's murder conviction. We resolve Smith's first issue against him.

## HEARSAY OBJECTIONS

In his second and third issues, Smith complains the trial court erred in overruling his hearsay objections to Detective Vann's testimony in two instances. The State responds that, with regard to the first instance, any error was cured because the same evidence was admitted without objection later in the trial. With regard to the second instance, the State responds that error was not preserved; and, regardless, any error was harmless.

### Standard of Review

We review the trial court's decision to admit evidence under an abuse of discretion standard. *See Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). We will not reverse the trial court's ruling, as long as it was within the zone of reasonable disagreement. *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g).

### Applicable Law

Hearsay is a statement, other than one made by the declarant while testifying at trial, offered into evidence to prove the truth of the matter asserted. TEX. R. EVID. 801(d). Hearsay is generally not admissible. *Id.* at 802.

Police officers and police detectives, however, may testify to information that might otherwise be considered hearsay in order to explain the course of an investigation and how the defendant became a suspect. *Dinkins v. State*, 894 S.W.2d 330, 347 (Tex. Crim. App. 1995); *Lee v. State*, 29 S.W.3d 570, 577 (Tex. App.—Dallas 2000, no pet.). "An officer's testimony is not hearsay when it is admitted, not for the truth, but to establish the course of events and

–14–

circumstances leading to the arrest." *Thorton v. State*, 994 S.W.2d 845, 854 (Tex. App.—Fort Worth 1999, pet. ref'd). *See also Poindexter v. State*, 153 S.W.3d 402, 408 n.21 (Tex. Crim. App. 2005) ("testimony by an officer that he went to a certain place or performed a certain act in response to generalized 'information received' is normally not considered hearsay because the witness should be allowed to give some explanation of his behavior"), *abrogated on other grounds by Robinson v. State*, 466 S.W.3d 166, 173 n.32 (Tex. Crim. App. 2015); *Schaffer v. State*, 777 S.W.2d 111, 114–15 (Tex. Crim. App. 1989) ("[A]n arresting officer should not be put in the false position of seeming just to have happened upon the scene, he should be allowed some explanation of his presence and conduct."). However, the testifying officer is not permitted to relate "historical aspects of the case, replete with hearsay statements in the form of complaints and reports, on the grounds that [he] was entitled to tell the jury the information upon which [he] acted." *Schaffer*, 777 S.W.2d at 114–15. The critical question is whether there is an inescapable conclusion that the evidence is being offered to prove the truth of statements made outside the courtroom. *Id.*

**Analysis**

*Detective Vann's Testimony to Statements Made by Smith's Aunt*

In his second issue, Smith complains the trial court erroneously permitted Detective Vann to testify to his conversation with Smith's aunt during the course of the investigation. The following exchange between the prosecutor and Detective Vann is the first instance of testimony Smith contends was inadmissible hearsay:

> Q: [Was] she able to provide any information about [Smith's] whereabouts?
>
> A: She was a sweet lady. She invited us in and we got to talk with her. And she says that [Smith] had come over to her –
>
> Mr. Guidry: I'm going to object at this point, Your Honor. Hearsay.
>
> The Court: To what?
>
> Mr. Guidry: Hearsay, I'm sorry.

The Court: Any reply?

Ms. Paver: It goes towards the detective's steps in the investigation.

The trial court overruled Smith's objection, and the prosecutor continued to question Detective Vann.

Q: You can go ahead.

A: When we talked to this lady, his aunt, she states that [Smith] comes over to her house and asked if he could take a shower and stay the night with her. She had heard through the grapevine that something happened, [she] just didn't know what exactly had happened. She permitted him to take a shower, and while he was in there, she said that he began to tell her that he had passed out.

Mr. Guidry: I'm going to object, Your Honor, at this point to hearsay.

The Court: Any reply?

Ms. Paver: It continues going to [Detective Vann's] steps in the investigation and why he continued pursuing the suspect.

Mr. Guidry: Your Honor.

The Court: Hold on. For that limited purpose, I'll allow it. . . .

Detective Vann testified:

Q: So just in regards to why you continued looking for [Smith], what was generally the information his aunt relayed to you?

A: His testimony in that he had been there.

Q: [Beyond] that, was she able to give you any information?

A: She did describe what he was wearing and what he was carrying.

Q: [Did] that lead you to any other locations?

A: Yes, ma'am.

Q: [What] was the next location you went to looking for him?

A: She mentioned a male by the name of Bo that worked at Parkland Hospital at the information desk. We didn't know Bo and that's all we knew. So once we left her house, we went to Parkland Hospital to try to find Bo. And the first information desk we came to I asked a young lady if she knew Bo, and she got on the phone and called, and it was her supervisor.

–16–

Q: So you eventually did make contact with this Bo person?

A: I did.

Shortly after this testimony, Smith's recorded police station interview was admitted into evidence and played for the jury, with no objection. The jury heard Smith concede that at some point after the murder, he went to see "Auntie Bernice" for thirty minutes to an hour. The jury then heard the following exchange between Smith and Detective Vann:

> Detective Vann: She said you went over there and took a shower and got cleaned up, is what she said . . . or wanted to.
>
> . . . .
>
> Smith: Yeah, I wanted to take a shower there, but I didn't stay.
>
> . . . .
>
> Detective Vann: Basically, what she said that you told her was the same thing you're telling us, which is that you guys was partying and you passed out and woke up and [Harris] was on top of you. The only new part was her cutting her throat like that. I didn't know that 'til now.

In the video, Smith nodded his head in agreement.

"An extrajudicial statement . . . offered for the purpose of showing *what* was said rather than for the *truth* of the matter stated therein does not constitute hearsay." *Dinkins*, 894 S.W.2d at 347. Detective Vann's testimony that Smith's aunt stated Smith had "come over to her" explains Detective Vann's presence and conduct–why he was talking to Smith's aunt and how he learned Smith might know a man named Bo. The State asked Detective Vann what information he obtained from Smith's aunt that led him to look for Smith at "other locations." Regardless of whether the statements made by Smith's aunt were true, they explained Detective Vann's course of action and why he went to Parkland Hospital to find Bo.

We conclude the trial court did not abuse its discretion by overruling Smith's hearsay objections because Detective Vann's testimony was not offered to prove the truth of the matter

asserted, but to show the steps he took to locate Smith, a potential suspect. *See Thorton*, 994 S.W.2d at 854.

Furthermore, to the extent Detective Vann's complained-of testimony constituted hearsay, any error in admitting it was harmless, because it was cumulative of the same or similar evidence subsequently admitted into evidence without objection. *See Mayes v. State*, 816 S.W.2d 79, 88 (Tex. Crim. App. 1991) (improper admission of character testimony was harmless because it established "substantially the same evidence" as other properly admitted testimony). Smith's videotaped interview with Detective Vann was admitted into evidence and played for the jury. In the interview, Smith told Detective Vann he went to his aunt's home to take a shower, and confirmed he told his aunt that he had "passed out." Therefore, any error was harmless. Tex. R. App. P. 44.2(b); *Brooks v. State*, 990 S.W.2d 278, 287 (Tex. Crim. App. 1999) ("any error in admitting [hearsay] evidence was harmless in light of other properly admitted evidence proving the same fact"); *see also Mayes*, 816 S.W.2d at 88.

*Detective Vann's Testimony to Statements Made by Branch*

In his third issue, Smith complains the trial court erroneously permitted Detective Vann to testify to a conversation he had with Branch during the course of the investigation. Smith contends the following exchange between the prosecutor and Detective Vann was inadmissible hearsay:

> A: I'd heard from Terry [Branch] that he heard from - - I don't have a clue who he heard it from.
>
> Mr. Guidry: I'm going to object, Your Honor. Hearsay.
>
> The Court: Any reply?
>
> Ms. Paver: Your Honor, it goes to the steps of his investigation.
>
> The Court: Your objection is overruled for that limited purpose.
>
> Q: (By Ms. Paver) You can continue.
>
> A: He said that he had heard from somebody that [Harris] had got hit in the head with the Jack Daniel's bottle. Which at this point in time we knew that

–18–

there was blunt force trauma. We went back through the pictures, the forensic photos. One of the detectives recalled that he did see a Jack Daniel's bottle at the scene. So we started scanning through pictures at that point in time. We got a new piece of information and if there is evidence at that crime scene, we need to go back and get it. We located the Jack Daniel's bottle in one of the pictures. At that point in time we sent forensics back to the location to get this Jack Daniel's bottle.

We haven't heard any other information [that] could confirm that this story was true. It was just something that somebody said. We can't say it's true or negative. We just needed that piece of evidence until, in case we found out otherwise.

Q: And to be clear, [Branch] had not told you directly that he had seen [Smith] hit [Harris] with a Jack Daniel's bottle?

A: No, ma'am. That's correct.

Q: What had [Branch] told you directly about the Jack Daniel's bottle.

A: That it was just, that he had, it was used.

The State contends Smith failed to preserve its hearsay complaint, because this testimony involved hearsay within hearsay, and Smith did not object on the grounds of double-hearsay. Regardless of whether Smith failed to preserve this issue for review, we conclude the admission of Detective Vann's testimony did not affect Smith's substantial rights.[7]

We review non-constitutional erroneous admission of evidence under rule 44.2(b). TEX. R. APP. P. 44.2(b). Under rule 44.2(b), we disregard the error unless it affected the defendant's substantial rights. *Barshaw v. State*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011). We "will not overturn a criminal conviction for non-constitutional error [if,] *after examining the record as a whole*, [we have] fair assurance that the error did not influence the jury, or influenced the jury only slightly." *Id.* (quoting *Schutz v. State*, 63 S.W.3d 442, 444 (Tex. Crim. App. 2001)).

---

[7] For the first time on appeal, Smith complains the trial court's admission of Detective Vann's testimony deprived him of "due process of law and a fair trial." However, at trial, Smith did not object to Detective Vann's testimony on the grounds it denied him due process of law or a fair trial, and nothing in the record indicates the judge or prosecutor understood Smith's evidentiary objection to be a complaint of a denial of due process. "Even constitutional errors may be waived by failure to object at trial." *Briggs v. State*, 789 S.W.2d 918, 924 (Tex. Crim. App. 1990). Smith's general hearsay objection did not preserve error on a denial of due process claim, and any complaint of constitutional error is waived. *Clark v. State*, 365 S.W.3d 333, 340 (Tex. Crim. App. 2012).

The hearsay statements Smith complains of were not important to the State's case, and were neutralized by Detective Vann's subsequent testimony. The trial evidence, as well as the State's closing argument, focused on the severity and number of sharp- and blunt-force injuries Harris sustained; evidence indicating that Smith was the last person seen with Harris alive; the fact that Smith entered the apartment with Harris at 2:30 a.m. on January 1 and did not "c[o]me out until around 6 o'clock the next day" after Harris was killed; and the unlikelihood of Smith's claim that Harris committed suicide by slitting her throat. The State conceded in its closing argument, "we don't know what . . . deadly weapons were used in this case against Linda Harris." Moreover, Detective Vann testified that the exterior of the bottle did not "appear it had been used in an assault in any way" and he believed the bottle provided "no evidentiary value." He explained he did not have "any other information [that] could confirm that this story was true. . . . We can't say it's true or negative. We just needed [to collect the bottle] in case we found out otherwise." Given the record before us, we conclude that any error in admitting the complained-of testimony did not affect Smith's substantial rights. TEX. R. APP. P. 44.2(b).

We resolve Smith's third issue against him.

### MOTION FOR DIRECTED VERDICT AND JURY CHARGE

In his fourth issue, Smith contends the trial court erred in denying his motion for directed verdict on the ground the evidence was insufficient to prove beyond a reasonable doubt that asphyxiation was a cause of Harris' death. In his fifth issue, Smith contends the trial court erred in "charging the jury on the issue of guilt/innocence as to the manner and means of committing the offense of murder by asphyxiating the deceased by a means unknown to the grand jury" (original in all capital letters). We address Smith's fourth and fifth issues together, as they involve the same facts and similar issues of law.

According to Smith, "there was no evidence or insufficient evidence presented by the State to allow the jury to consider convicting [Smith]" on the theory Smith asphyxiated her. In support of his argument, Smith points to Dr. Rahaman's testimony that he could not "conclusively" say Harris was asphyxiated. On this basis, Smith argues the trial court erred by denying his motion for directed verdict with respect to the asphyxiation allegation in the indictment and complains the jury charge improperly allowed the jury to convict him of murder on a manner-and-means theory of asphyxiation.

**Standard of Review**

*Motion for Directed Verdict*

A challenge to the trial court's denial of a motion for a directed verdict is treated as a challenge to the sufficiency of the evidence. *Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996). Evidence is sufficient when, viewed in the light most favorable to the verdict, a rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Id.* at 482–83 (quoting *Jackson*, 443 U.S. 307).

*Jury Charge*

"[A]lleged jury-charge error must be considered on appellate review regardless of preservation in the trial court." *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). In reviewing a jury charge, we first determine whether error occurred. *Id.* If error did not occur, our analysis ends. *Id.* If error occurred, the level of harm required for reversal depends on whether the defendant objected to the jury charge at trial. *Id.* If a defendant failed to object to the jury charge at trial, he must show on appeal that he suffered "egregious harm" in order to obtain a reversal. TEX. CODE CRIM. PROC. ANN. art. 36.19; *Mendez v. State*, 545 S.W.3d 548, 552 (Tex. Crim. App. 2018). The egregious harm must be such that the defendant was deprived of a fair and impartial trial. *Mendez*, 545 S.W.3d at 552. If the defendant timely objected to the jury charge at

trial, reversal is required if the reviewing court finds "some harm" to the defendant. *Id.* Here, Smith did not object to the jury charge, as submitted to the jury.

**Analysis**

Smith was charged with murder, and both the indictment and the jury charge included three alternative manner-and-means theories for the offense. Smith claims the trial court should have granted his motion for directed verdict with respect to the asphyxiation manner-and-means theory for a murder conviction because "the State failed to present any evidence [that] would support a unanimous verdict of guilty in regard to asphyxiation." For the same reason, Smith claims the trial court erred by including the asphyxiation manner-and-means theory for murder in the jury charge. The record, however, includes sufficient evidence of asphyxia.

A trial court must deliver to the jury a written charge distinctly setting forth the law applicable to the case. TEX. CODE CRIM. PROC. ANN. art. 36.14. The jury charge must apply the law to the facts adduced at trial. *Gray v. State*, 152 S.W.3d 125, 127–28 (Tex. Crim. App. 2004). The trial court's jury instructions should include only alternative theories of how a defendant committed an offense alleged in the indictment if the evidence presented at trial supports those theories. *Sanchez v. State*, 376 S.W.3d 767, 774 (Tex. Crim. App. 2012). Neither the manner nor the means of committing the offense needs to be unanimously agreed upon by the jury. *Ngo v. State*, 175 S.W.3d 738, 746 n.27 (Tex. Crim. App. 2005) (noting jury must be unanimous on the gravamen of the offense of murder, which is causing the death of a person, but jury need not be unanimous on the manner and means). The jury need only unanimously agree that the defendant caused the victim's death. *Id.* at 746.

Here, in accordance with the wording of the indictment, the jury charge allowed the jury to convict Smith of murder if the evidence proved beyond a reasonable doubt that: (a) he

intentionally or knowingly caused Harris' death, or (b) intended to cause serious bodily injury to Harris, committed an act clearly dangerous to human life, and caused Harris' death by:

> (1) causing blunt-force injuries to Harris with an unknown object, a deadly weapon;
>
> (2) causing sharp-force injuries to Harris with an unknown object, a deadly weapon; or
>
> (3) asphyxiating Harris by a unknown means, with an unknown object, a deadly weapon,

Based on record evidence, a reasonable jury could find asphyxiation played a role in Harris' death. Dr. Rahaman testified that "immediate[ly] before death, [Harris had] necrosis or death of some of her brain cells, called *neurons*, and then her brain was also mildly swollen or had mild generalized edema." According to Dr. Rahaman, these findings indicated a "global lack of oxygen to [Harris'] brain," indicating asphyxiation. While Dr. Rahaman "could not say [asphyxia was] exactly the mechanism," she confirmed, "[t]here are pathologic findings suggesting that she [had] asphyxia." Based on her autopsy, Dr. Rahaman identified Harris' cause of death as "homicidal violence due to blunt and sharp force injuries"; concluded "the totality, combination of all her injuries together" contributing to Harris' death; and, testified that asphyxia "may have played a role" in her death.

While the physical evidence of asphyxia identified by Dr. Rahaman was limited to the necrosis of Harris' brain cells prior to her death, and swelling and edema of Harris' brain, Dr. Rahaman testified there are "many" scenarios in which "someone could asphyxiate without showing any signs externally or even internally." By way of example, Dr. Rahaman stated, "*positional asphyxia* [occurs] if someone's not able to protect their airway"; and, "*smothering* [occurs] if someone's mouth or nose is covered by an object."

In this case, the theory of asphyxiation as one of three alternative manner and means for the offense of murder could be supported by the evidence given by the medical examiner at trial.

We conclude that, viewed in the light most favorable to a finding of asphyxiation, a rational jury could have found beyond a reasonable doubt that asphyxiation could have played a role in Harris' death. Therefore, the trial court did not err in denying Smith's motion for directed verdict. We resolve Smith's fourth issue against him.

For the same reasons, we conclude the jury instruction on the theory of asphyxiation as one of three alternative manner and means for the offense of murder was properly submitted to the jury. We resolve Smith's fifth issue against him.

## MODIFICATION OF JUDGMENT

In a single cross-point, the State contends the judgement incorrectly reflects that the jury assessed punishment. The State requests that we modify the judgment to reflect that the trial court assessed punishment.

Texas Rule of Appellate Procedure 43.2(b) allows an appellate court to "modify the trial court's judgment and affirm it as modified." TEX. R. APP. P. 43.2(b). An appellate court has the power to modify incorrect judgments when the evidence necessary to correct a judgment appears in the record. *See Asberry v. State*, 813 S.W.2d 526, 529 (Tex. App.—Dallas 1991, pet. ref'd). Here, the transcript of the sentencing phase of the trial reflects the trial court assessed punishment. We conclude we have the necessary evidence to correct the judgment. Accordingly, we modify the judgment to reflect the trial court assessed punishment.

As modified, we affirm the trial court's judgment.

/Ken Molberg/
KEN MOLBERG
JUSTICE

Do Not Publish
TEX. R. APP. P. 47

180491F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

RODNEY COLLINS SMITH, Appellant

No. 05-18-00491-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 292nd Judicial District Court, Dallas County, Texas

Trial Court Cause No. F-18-00143-V.

Opinion delivered by Justice Molberg.

Justices Whitehill and Reichek participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED**, and **AFFIRMED**, as modified.

Judgment entered this 15th day of April, 2019.